**Case No. 19-40566, Consolidated with: 19-40643**

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

———————————

HTC CORPORATION; HTC AMERICA, INCORPORATED,

Plaintiffs-Appellants,

v.

TELEFONAKTIEBOLAGET LM ERICSSON; ERICSSON, INCORPORATED,

Defendants-Appellees.

———————————

On Appeal from the United States District Court
for the Eastern District of Texas

———————————

## BRIEF FOR THE UNITED STATES OF AMERICA
## AS AMICUS CURIAE IN SUPPORT OF NEITHER PARTY

———————————

THOMAS W. KRAUSE
  *Solicitor*
NICHOLAS T. MATICH
  *Senior Legal Advisor to the Under*
  *Secretary and Director*
MEREDITH H. SCHOENFELD
KAKOLI CAPRIHAN
  *Associate Solicitors*

*United States Patent and Trademark Office*
*Mail Stop 8, P.O. Box 1450*
*Alexandria, Virginia 22313*
*(571) 272-9035*

MAKAN DELRAHIM
  *Assistant Attorney General*
MICHAEL F. MURRAY
  *Deputy Assistant Attorney General*
WILLIAM J. RINNER
  *Chief of Staff and Senior Counsel*
DANIEL E. HAAR
JENNIFER M. DIXTON
  *Attorneys*

*United States Department of Justice*
*Antitrust Division*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 353-3100*

*Counsel for the United States of America*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................ ii

STATEMENT REGARDING ORAL ARGUMENT .................................................. 1

INTEREST OF THE UNITED STATES ............................................................. 1

ISSUES PRESENTED ................................................................................ 2

STATEMENT OF THE CASE ......................................................................... 3

I.    Patents and Industry Standards ....................................................... 3

II.   Facts and Prior Proceedings ........................................................... 6

III.  Applicable Law ............................................................................ 11

SUMMARY OF ARGUMENT .......................................................................... 16

ARGUMENT .............................................................................................. 17

I.    HTC Misstates the Law on Apportionment ......................................... 17

      A.    Apportionment can be satisfied by market evidence ................... 17

      B.    Requiring component-based royalties is contrary to sound
            innovation policy ....................................................................... 19

II.   HTC's Proposed Non-Discrimination Instruction Would Create Error .......... 23

III.  SSOs and Individual Parties May Use Component-Based Royalties or
      Specify FRAND Obligations in Appropriate Cases .................................. 26

CONCLUSION ............................................................................................ 26

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## Cases

*Apple, Inc., v. Motorola Mobility, Inc.,*

886 F.Supp.2d 1061 (W.D. Wis. 2012) ........................................................... 5

*Aqua Shield v. Inter Pool Cover Team,*

774 F.3d 766 (Fed. Cir. 2014)..................................................................12, 14, 15

*Birdsall v. Coolidge,*

93 U.S. 64 (1876) ......................................................................................... 12

*Commonwealth Scientific & Industrial Research Organisation v. Cisco Systems, Inc.,*

809 F.3d 1295 (Fed. Cir. 2015) ................................................................passim

*Elbit Systems Land & C4I Ltd. v. Hughes Network Systems, LLC,*

927 F.3d 1292 (Fed. Cir. 2019) ...................................................................... 15

*Ericsson, Inc. v. D-Link Systems, Inc.,*

773 F.3d 1201 (Fed. Cir. 2014) ................................................................passim

*Exmark Manufacturing Co. Inc. v. Briggs & Stratton Power Products Group, LLC,*

879 F.3d 1332 (Fed. Cir. 2018) ..................................................... 12, 13, 14, 19

*Fujifilm Corp. v. Benun,*

605 F.3d 1366 (Fed. Cir. 2010) ................................................................14, 19

*LaserDynamics, Inc. v. Quanta Computer, Inc.,*

694 F.3d 51 (Fed. Cir. 2012)...................................................... 13, 14, 19, 22

*Lucent Technologies, Inc. v. Gateway, Inc.,*

580 F.3d 1301 (Fed. Cir. 2009) ................................................................13, 20

*Microsoft Corp. v. Motorola, Inc.,*

  696 F.3d 872 (9th Cir. 2012) ......................................................................5, 6, 12

*Microsoft Corp. v. Motorola, Inc.,*

  795 F.3d 1024 (9th Cir. 2015) ...........................................................................passim

*Monsanto Co. v. McFarling,*

  488 F.3d 973 (Fed. Cir. 2007)........................................................................... 12

*Simpson v. Union Oil Co. of California,*

  377 U.S. 13 (1964) .............................................................................................. 1

*Sprint Communications Co. v. Time Warner Cable, Inc.,*

  760 F. App'x 977 (Fed. Cir. 2019) .............................................................. 15, 16

*TCL Communication Technology Holdings, Ltd. v. Telefonaktiebolaget LM Ericsson,*

  No. CV 15-2370 JVS(DFMX), 2018 WL 4488286 (C.D. Cal. Sept. 14, 2018) ........... 4

*u-blox AG v. InterDigital, Inc.,*

  No.:3-19-cv-001-CAB-(BLM) (S.D. Cal. April 11, 2019) ........................................ 23

*Virnetx, Inc. v. Cisco Systems, Inc.,*

  767 F.3d 1308 (Fed. Cir. 2014) ......................................................................14, 15, 19

**Statutes**

35 U.S.C. § 284...................................................................................................... 12

**Other Authorities**

Dep't of Justice & Fed. Trade Comm'n, *Antitrust Guidelines for the Licensing of*

  *Intellectual Property* (2017) .................................................................................. 1

Eric Stasik, *Royalty Rates and Licensing Strategies for Essential Patents on LTE (4G) Telecommunication Standards*, les Nouvelles (Sept. 2010) ............................................. 6, 22

ETSI Press Release, *ETSI's Director General Issues Public Statement on IPR Policy*, (December 3, 2018) ....................................................................................... 5, 18, 24

ETSI, *Guide on Intellectual Property Rights* (2013) ............................................. 5, 24

ETSI, *Rules of Procedure, Annex 6: Intellectual Property Rights Policy* (2019) .................... 4, 11

European Commission, *Setting Out the EU Approach to Standard Essential Patents* (2017) .................................................................................................... 5, 24

Garrard Beeney & Renata Hesse, *The Intellectual Property and Antitrust Review* (Thomas Vinje ed., 4th ed. 2019) ......................................................................... 5, 12

Jorge Contreras, *Origins of FRAND Licensing Commitments in the United States and Europe*, The Cambridge Handbook of Technical Standardization Law (Jorge Contreras ed., 2018) ............................................................................................ 5

Kelce S. Wilson, *Designing a Standard Essential Patent (SEP) Program*, les Nouvelles (Sept. 2018) ...................................................................................................... 6

Kirti Gupta, *How SSOs Work: Unpacking the Mobile Industry's 3 GPP Standards*, The Cambridge Handbook of Technical Standardization Law (Jorge Contreras ed., 2018) ............................................................................................ 3, 4

Raymond T. Nimmer & Jeff C. Dodd, *Modern Licensing Law* (2018) .................... 6, 22, 25

11 *Williston on Contracts* (4th ed. 2012) ................................................................. 12

## STATEMENT REGARDING ORAL ARGUMENT

The United States, as amicus curiae, respectfully requests oral argument. As explained below, this case involves an issue of first impression for this Court that is important to federal innovation policy.

## INTEREST OF THE UNITED STATES

The United States, through the Department of Justice Antitrust Division, has an interest in protecting and promoting competition in the U.S. economy. The United States furthers this interest most often by enforcing the antitrust laws, but it also does so through promoting sound interpretation and enforcement of laws that protect patent rights and reward invention. The antitrust laws and intellectual property laws are "*in pari materia.*" *Simpson v. Union Oil Co. of Cal.*, 377 U.S. 13, 24 (1964). They "share the common purpose of promoting innovation and enhancing consumer welfare." Dep't of Justice & Fed. Trade Comm'n, *Antitrust Guidelines for the Licensing of Intellectual Property* § 1.0 (2017). Thus, the United States seeks to advance consistent and correct application of these two bodies of law in order to promote innovation and spur competition among innovators to create new and useful technologies, products, or services for consumers.

Similarly, the United States, through the U.S. Patent and Trademark Office ("USPTO"), advances its interest in promoting a strong and effective patent system. The USPTO is the executive-branch agency charged with examining patent applications, issuing patents, and—through the Secretary of Commerce—advising the

President on intellectual property policy. In doing so, the USPTO promotes the strength and vitality of the U.S. economy, which depends on effective mechanisms to protect new ideas and investments in innovation.

This case concerns how juries should be instructed in contractual disputes over the licensing of "standard essential patents" ("SEPs"), patents which cover technology that is integral to an industry standard, typically an interoperability standard. SEPs and the interoperability that standardization allows across products, ranging from cell phones, automobiles, and the internet of things, are vital to the United States economy and provide substantial benefit to American consumers. To that end, the rights of both SEP holders and implementers of standards must be balanced. Incorrect interpretations of patent laws and related doctrines as they are applied to SEPs may result in SEP holders receiving lower revenue streams for their inventions or implementers paying too much for the use of a patented technology, either of which has the potential to diminish innovation and competition. The United States files this amicus brief, pursuant to Fed. R. App. P. 29(a)(2), to clarify the standards of law that should be applied in this case.

## ISSUES PRESENTED

Whether evidence of comparable prior licenses in a FRAND dispute is sufficient to demonstrate the offer of a "reasonable" royalty.

Whether a license structure that imposes different costs on different firms is non-discriminatory.

## STATEMENT OF THE CASE

### I.    Patents and Industry Standards

Many industries, especially the electronics and telecommunications industries, depend on common standards to permit interoperability among products made by different manufacturers. *Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1208 (Fed. Cir. 2014). These standards permit, for example, cellular telephones made by one company to communicate with the cellular sites manufactured by another company, and operated by yet another. *See id.* Standardization generally enhances competition and consumer welfare. *See Microsoft Corp. v. Motorola, Inc.*, 795 F.3d 1024, 1030 (9th Cir. 2015) ("*Microsoft II*"). The process of setting standards involves many parties and is facilitated by standard setting organizations ("SSOs") which publish lists of technical requirements for compatibility. *D-Link*, 773 F.3d at 1208. The relevant SSO here is the European Telecommunications Standards Institute ("ETSI"), a non-profit entity organized under French law.[1] Among other activities, ETSI works to establish global wireless standards that have been widely adopted in the United States, Europe, and other jurisdictions.[2]

Often, different solutions to technical problems in an industry are available and become embodied in different, competing standards. *See D-Link*, 773 F.3d at 1208

---

[1] About ETSI, https://www.etsi.org/about.
[2] *See id.*; Kirti Gupta, *How SSOs Work: Unpacking the Mobile Industry's 3 GPP Standards* in The Cambridge Handbook of Technical Standardization Law 32-36 (Jorge Contreras ed., 2018).

n.1, 1233.  Once standards are set, industries frequently gravitate towards one standard, even if several are available.  In the wireless industry, "LTE" won out over its rivals to become the dominant 4G standard.  *Gupta*, *supra* note 2, at 33.  In many cases, the technical solutions adopted in standards are covered by patents.  When competing standards use patented technology, manufacturers in the industry are usually unwilling to adopt the standard over others without a commitment from patent owners that they will offer a license to the patents on reasonable terms.  *See Microsoft II*, 795 F.3d at 1031.

At the same time, patent owners want their technology to be adopted as part of an industry standard to gain an edge for their products and obtain licensing revenue.  *See, e.g.*, *TCL Commc'n Tech. Holdings, Ltd. v. Telefonaktiebolaget LM Ericsson*, No. CV 15-2370 JVS(DFMX), 2018 WL 4488286, at *13 (C.D. Cal. Sept. 14, 2018).  If a competitor's alternative technology is adopted, demand for a patent owner's products may decline substantially.  *See, e.g.*, *TCL*, 2018 WL 4488286, at *13.  Thus, to avoid that outcome, patent owners usually agree with SSOs *ex ante* to license their SEPs on "fair, reasonable, and non-discriminatory" ("FRAND") terms so that their technology may be chosen.  *See, e.g.*, *id.*; ETSI*, Rules of Procedure, Annex 6: Intellectual Property Rights Policy* §§ 4, 6 (2019).  Implementers of the standard are considered third-party beneficiaries of the contract between the SSO and SEP holder, which allows them to enforce the SEP owner's FRAND obligations.  *See, e.g.*, *Apple, Inc., v. Motorola Mobility, Inc.*, 886 F. Supp. 2d 1061, 1085 (W.D. Wis. 2012); *Microsoft II*, 795 F.3d at 1030, 1033;

Garrard Beeney & Renata Hesse, *The Intellectual Property and Antitrust Review* 228-30

(Thomas Vinje ed., 4th ed. 2019); Dkt.538 at 3.[3]

Most SSOs, including ETSI, have not specified what FRAND means, in order

to allow flexibility in the parties' later licensing negotiations.[4]  In 1993, ETSI's

Intellectual Property Policy included a "most-favored license clause," requiring SEP

owners to offer past licensees any terms it offered to subsequent licensees that were

"clearly more favourable" than those previously offered.[5]  ETSI abandoned this

policy in 1994, in favor of its current, less-specific non-discrimination requirement.

*Id.*  In general, "there is no one-size-fit-all solution to what FRAND is: what can be

considered fair and reasonable differs from sector to sector and over time."

European Commission, *Setting Out the EU Approach to Standard Essential Patents* 6 (Nov.

29, 2017).

While licensing terms vary, there are some common wireless industry practices.

SEP owners commonly own patents in numerous jurisdictions relevant to a particular

---

[3] Citations to "Dkt." refer to the district court docket below.

[4] *Microsoft Corp. v. Motorola, Inc.*, 696 F.3d 872, 876 (9th Cir. 2012) (*Microsoft I*); ETSI Press Release, *ETSI's Director General Issues Public Statement on IPR Policy*, https://www.etsi.org/newsroom/news/1458-etsi-s-director-general-issues-public-statement-on-ipr-policy(December 3, 2018) ("Director General Statement"); ETSI, *Guide on Intellectual Property Rights* § 4.1 (2013).

[5] Jorge Contreras, *Origins of FRAND Licensing Commitments in the United States and Europe* in The Cambridge Handbook of Technical Standardization Law 168 (Jorge Contreras ed., 2018).

standard.[6]  They often license all or substantial parts of their SEP portfolios on a

world-wide basis to manufacturers of standard-compliant end-user devices.  *See supra*

note 6.  Such licenses frequently cover all of a manufacturer's standard-compliant

products with a royalty based on the sale price of those products, a fixed per-device

royalty, or a lump sum payment.[7]  Manufacturers who are also SEP owners sometimes

cross-license patents as part of the consideration in the agreement.  *D-Link*, 773 F.3d

at 1227; Stasik, *supra* note 6, at 115.

## II.    Facts and Prior Proceedings

ETSI adopted patented technology belonging to Telefonaktiebolaget LM

Ericsson and Ericsson, Inc. ("Ericsson") for portions of its wireless standards, and

Ericsson agreed with ETSI, pursuant to ETSI's intellectual-rights policy, to license its

SEPs on FRAND terms.  Dkt.538 at 3.  Ericsson has since licensed these SEPs to a

number of standards implementers, including Apple, BLU, Coolpad, Doro, Fujitsu,

Huawei, Kyocera, LG, Panasonic, Samsung, Sony, and ZTE.  *Id.* at 11-12.  The

district court found that Ericsson's agreement with ETSI is governed by French law

---

[6] *See, e.g.*, *Microsoft I*, 696 F.3d at 877; Eric Stasik, *Royalty Rates and Licensing Strategies for Essential Patents on LTE (4G) Telecommunication Standards*, les Nouvelles 119 n.33 (September 2010).

[7] *See Microsoft II*, 795 F.3d at 1044; Raymond T. Nimmer & Jeff C. Dodd, § 7:4 *Running royalties and allocating market risk*, *in Modern Licensing Law* (2018); Kelce S. Wilson, *Designing a Standard Essential Patent (SEP) Program*, les Nouvelles 207 (September 2018); Dkt.538 at 10.

and that standards implementers are third-party beneficiaries entitled to enforce the contract.  Dkt.538 at 7.

HTC Corp. and HTC America, Inc. ("HTC") design, manufacture, and sell smartphones that implement ETSI's standards.  Dkt.538 at 2.  HTC had previously licensed Ericsson's cellular SEPs, and in 2016, the parties entered negotiations to renew that license.  Dkt.538 at 4.  Ericsson made various offers which it says remain open to HTC, but the parties did not reach an agreement.  *Id.*

### 1.    The Proceedings

In April 2017, HTC sued Ericsson alleging various causes of action relating to the breakdown in negotiations.  *Id.*  Among other things, HTC alleged that Ericsson's FRAND commitment requires that SEP royalties be based on the value of the "smallest saleable patent practicing unit" ("SSPPU"), i.e., only on an identifiable potentially infringing component of HTC's devices.  Dkt.136 at 16, 32.  HTC contended that the SSPPU was the baseband processor, i.e., the chip that connects a phone to data networks.  Dkt.538 at 8.  Since Ericsson insisted that the license royalty be calculated on the value or number of the end devices sold, as in their previous agreements, not the SSPPU, HTC alleged that Ericsson had breached its FRAND commitment.  *Id.*  In addition to seeking enforcement of the ETSI contract going forward, HTC sought damages for past licensing agreements with Ericsson that did not use an SSPPU royalty.  Dkt.136 at 33.  HTC also brought antitrust claims. Dkt.136 at 34-36; Dkt.220 at 24.  Ericsson counterclaimed, seeking, among other

things, a declaratory judgment that it had not breached its FRAND obligation.

Dkt.538 at 4. The Court severed many of HTC's claims, including the antitrust claims

and claims for damages under prior license agreements, and allowed the portion of

HTC's case relating to future FRAND licenses to proceed. Dkt.220 at 24. The

severed claims are not at issue here.

At trial, Ericsson presented evidence of its prior licensing agreements with the

Before trial, the court granted Ericsson's motion for a determination of foreign

law regarding its contract with ETSI. It held that ETSI's FRAND policy "neither

*requires* nor *precludes* a license with a royalty based on the SSPPU. Rather, whether a

license meets the requirements of FRAND will depend on the particular facts of the

case, as there is no prescribed methodology for calculating a FRAND license." Dkt.

376 at 12.

At trial, Ericsson presented evidence of its prior licensing agreements with the

licensees mentioned above, as well as offers made to other implementers. Dkt.538 at

11-12. Ericsson provided testimony that these licenses and offers were similar to the

terms that it offered to HTC, and therefore FRAND. Dkt.538 at 13. HTC presented

competing interpretations of these licenses and argued that many of Ericsson's

licenses with other companies contained terms better than those it offered to HTC.

*Id.* HTC further argued that an SSPPU approach was more consistent with FRAND.

Dkt.538 at 8, 13. Ericsson, however, presented evidence that, *inter alia*, many of the

allegedly discriminatory licenses included "cross-license provisions and lump sum

payments" which "provided significant value to Ericsson," compensating it for the

otherwise less favorable terms in those agreements.  *Id.* at 13-14.  Ericsson also

disputed whether the baseband processor was the SSPPU as HTC contended.  *Id.* at

8-9.

### 2.     The Jury Instructions

HTC requested several specific jury instructions regarding how to evaluate a

SEP license offer.  Among other requests, HTC asked the court to instruct jury that

unless the patented invention was the "sole basis for demand" for the product "using

the entire value of the whole product as the royalty base does not comply with

FRAND."  Dkt.464-1 at 14.  Additionally, HTC asked for an instruction that one

method of apportioning the patented invention was to base the royalty on the SSPPU.

Dkt.464-1 at 15.

HTC also requested an instruction that "[t]he non-discrimination requirement

of FRAND requires an SEP holder to provide similar licensing terms to licensees that

are similarly situated."  Dkt.464-1 at 17-19.  According to HTC's instruction,

"licensees are 'similarly situated' if they compete for the purchase or sale of a product

or service."  *Id.*  A license term is discriminatory under HTC's instruction if it puts

one firm at a "competitive disadvantage" vis-à-vis "similarly situated" firms, i.e., any

firm with which it competes, or if it favors "large or powerful" firms over "small or

weak firms" or "imposes different costs" on such firms.  *Id.*

Ericsson requested that the jury be told that, in determining whether Ericsson's

offers were FRAND, they "may consider the royalty rates paid by other companies

situated similarly to HTC" and "should evaluate the proposed royalty based on the value of the patent holder's patented invention(s), not any additional value solely attributable to the standard's adoption of the patented invention(s)." Dkt.464-1 at 21-22. Ericsson also asked that the jury be instructed that the FRAND commitment does not require Ericsson to offer HTC an SSPPU royalty. *Id.* at 20-21.

The Court declined to adopt either party's FRAND instruction and charged the jury:

> Ericsson made a commitment to ETSI [with HTC as a third-party beneficiary] that [Ericsson] would license its [SEPs] … on terms that are fair, reasonable, and non-discriminatory, otherwise known as FRAND terms. Whether or not a license is FRAND will depend upon the totality of the particular facts and circumstances existing during the negotiations and leading up to the license…. [T]here is no fixed or required methodology for setting or calculating the terms of a FRAND license rate.

Dkt.480 at 19. The verdict form asked the jury if "Ericsson breached its contractual obligation to offer HTC a license[] on FRAND terms …." and whether either party violated its duty to negotiate in good faith. Dkt.457 at 2-4. The jury returned findings that both parties breached their obligation to negotiate in good faith, but that Ericsson had *not* breached its duty to offer a FRAND license. Dkt.457 at 2-4.

### 3.    The District Court's Opinion

In May 2019, the district court entered a declaratory judgment consistent with the jury's finding that Ericsson had offered HTC a FRAND license. Dkt.538. The court noted that "HTC's primary assertion … is that Ericsson should have based its royalty calculation on the … SSPPU." Dkt.538 at 8. The court found that there was

sufficient evidence for the jury to reject HTC's SSPPU approach because, among other reasons, the market "has failed to embrace HTC's preferred SSPPU methodology." Dkt.538 at 11. The court also concluded that "the jury necessarily rejected HTC's arguments that Ericsson's offers resulted in discrimination against HTC" and found that Ericsson's offers to HTC were FRAND. *Id.* at 13-15. The court entered declaratory judgment for Ericsson accordingly. *Id.*

HTC now appeals, arguing that Ericsson's FRAND commitment incorporates the U.S. patent law doctrine of "apportionment"—the requirement that the patent holder receive as damages only the value of its invention—and that the jury's verdict should be vacated, because the court failed to instruct the jury properly on apportionment. HTC also contends that the court failed to instruct the jury properly regarding the "non-discrimination" element of Ericsson's FRAND commitment.

## III.    Applicable Law

The obligation to offer a license on FRAND terms sounds in contract law, not patent law. ETSI, *Rules of Procedure Annex 6*, § 12. As here, the contract may be governed by foreign law and each contract may contain slightly different terms depending on the SSO involved. Thus, the determination of a FRAND royalty should begin with the applicable FRAND commitment at issue. *D-Link*, 773 F.3d at 1231. Most SSOs, including ETSI, do not define FRAND, in order to give patent owners and licensees freedom to craft agreements that suit their circumstances. *See Microsoft I*, 696 F.3d at 876; Beeney & Hesse, *supra* at 228. Moreover, there are only a

11

small number of circuit court opinions interpreting a FRAND commitment. However, one indicator of the meaning of FRAND commitments that courts have looked to for guidance is patent law, because it also uses the concept of a "reasonable royalty" as a measure of damages.  35 U.S.C. § 284; *Microsoft II*, 795 F.3d at 1040; *D-Link*, 773 F.3d at 1235; *cf.* 11 *Williston on Contracts* § 32:4 (4th ed. 2012).

A reasonable royalty for patent infringement is what, as "a business proposition," parties are "willing to pay … [to practice the patent], in the market, at a reasonable profit." *Aqua Shield v. Inter Pool Cover Team*, 774 F.3d 766, 770 (Fed. Cir. 2014).  Market-based evidence of prior licenses to the patent "may be the most effective method of estimating the asserted patent's value." *Commonwealth Sci. & Indus. Research Org. v. Cisco Sys., Inc.*, 809 F.3d 1295, 1303-04 (Fed. Cir. 2015) (*CSIRO*); *Monsanto Co. v. McFarling*, 488 F.3d 973, 979 (Fed. Cir. 2007) (the "best measure of" a reasonable royalty is usually prior licensing agreements) (citing *Birdsall v. Coolidge*, 93 U.S. 64, 70 (1876)).  "When the patentee has consistently licensed others to engage in conduct comparable to the defendant's," looking to those licenses "removes the need to guess at" what a reasonable royalty is, because the market has supplied one.  *Id.* Looking to existing licenses also helps courts and juries "accurately reflect[] … real-world bargaining" and determine "the proper form of the royalty structure." *Exmark Mfg. Co. Inc. v. Briggs & Stratton Power Prods. Grp.*, LLC, 879 F.3d 1332, 1349 (Fed. Cir. 2018); *LaserDynamics, Inc. v. Quanta Comput., Inc.*, 694 F.3d 51, 79-80 (Fed. Cir. 2012).

Nonetheless, under patent law, licensing evidence may not be a perfect measure of a reasonable royalty, because prior licenses "are almost never perfectly analogous to the infringement action." *D-Link*, 773 F.3d at 1227. "For example, allegedly comparable licenses may cover more patents than are at issue in the action, [or] include cross-licensing terms …." *Id.* Fact-finders may not award damages based on other factors, such as the value of the infringing product itself, the value that other patented technology may add to the product, or other consideration exchanged in prior licensing agreements, such as cross-licenses. Thus, damages testimony must "account for such distinguishing facts" when using past licenses, so that fact-finders can identify the value that the past license assigned to the technology at issue. *Id.* However, arguments "that a license is not perfectly analogous generally goes to the weight of the evidence, not its admissibility." *Id.* The requirement to focus on the value of the technology, and exclude other sources of value, is called "apportionment." *D-Link*, 773 F.3d at 1226.

Furthermore, licensing evidence is not always available. Parties are free to apportion and prove a technology's value other ways, but certain considerations apply. *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1324 (Fed. Cir. 2009). In particular, the Federal Circuit has said that evidence of the total profits or revenue of a complex product can mislead the jury regarding the value of a patented component and "artificially inflate the jury's damages calculation." *LaserDynamics*, 694 F.3d at 68. Thus, when using non-licensing evidence, royalties should generally "be based not on

13

the entire product, but instead on the" SSPPU, i.e., the infringing component. *Id.* at 67. This principle sometimes is referred to as the SSPPU rule. As a corollary to this rule, the "entire market value rule" ("EMVR") provides that a "patentee may be awarded damages as a percentage of revenues or profits attributable to the entire [infringing] product" only if the "patented feature drives the demand for [the] entire … product." *Id.* at 67.

The supposed appeal of a component-based royalty is that it is more closely tied to the value of the invention than an end-device-based royalty. But that is not necessarily so. For example, a patented cell phone component may vastly increase transmission speeds, and thus the value of a phone, but cost very little to make. Further, the choice between component and end unit base is "irrelevant" when the royalty is a flat per-unit charge rather than a percentage of the sales price, because the royalty will be the same regardless of the royalty base. *CSIRO*, 809 F.3d at 1303 n.1. Even when using a percent-of-sales-price royalty, a fact-finder could use any royalty *base*—end device, component, or something else—and adjust the royalty *rate* to arrive at any given total royalty or damages figure. *D-Link*, 773 F.3d at 1227; *Exmark*, 879 F.3d at 1348; *Fujifilm Corp. v. Benun*, 605 F.3d 1366, 1372-73 (Fed. Cir. 2010). Thus, the Federal Circuit has said that sometimes an end product royalty base can be too low and a component base can be too high. *See Aqua Shield*, 774 F.3d at 773; *Virnetx, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1329 (Fed. Cir. 2014). SSPPU and EMVR are simply heuristics courts use to "help our jury system reliably implement the

substantive statutory requirement of apportionment" in certain situations. *D-Link*, 773 F.3d at 1226. They are not required.

Specifically, SSPPU and EMVR are unnecessary when sufficiently comparable licensing evidence is available, because licensing evidence can inherently satisfy apportionment and FRAND requirements. Arms-length licensing transactions negotiated by sophisticated parties *directly* reflect the market value of technology—the value that SSPPU and EMVR try to *estimate* in an *ex post* infringement action. *Cf. Aqua Shield*, 774 F.3d at 770. Therefore, when a SEP holder presents to the fact-finder market-based evidence showing that comparable licenses were negotiated pursuant to a FRAND commitment, courts and juries do not need to apply an additional discount or artificially impose a particular structure on those agreements to identify a technology's value provided that the licenses are sufficiently comparable. The market has already identified it.

For example, in *D-Link*, the court noted that real-world "licenses are generally negotiated without consideration of" EMVR and refused to apply the rule to license-based evidence. *D-Link*, 773 F.3d at 1228. More recently, in *Elbit Systems Land & C4I Ltd. v. Hughes Network Systems, LLC*, the Federal Circuit agreed that "apportionment 'is essentially embedded'" in prior licensing agreements. 927 F.3d 1292, 1301 (Fed. Cir. 2019). Similarly, in *Sprint Communications Co. v. Time Warner Cable, Inc.*, the court said that evidence of past licenses to the same patents provides "strong support for" a licensing rate, "reflect[s] the incremental value of the inventions," and "satisfie[s] the

requirement of apportionment." 760 F. App'x 977, 983 (Fed. Cir. 2019).[8]  Likewise,

in *CSIRO,* the Federal Circuit said that it would be "untenable" to use component-

based royalties in every case, because real-world negotiations are the best evidence of

a technology's value and apportionment is "already built in" to the parties' bargaining.

809 F.3d at 1303.

Finally, the Federal Circuit has noted a few special apportionment

considerations in the SEP context.  First, as stated, fact-finders must look to the

FRAND commitment itself.  In cases where the SEP owners and SSOs have agreed

to define FRAND, that agreement controls.  *See D-Link*, 773 F.3d at 1231.  Second,

"SEPs can, and, often do, claim only limited aspects of the overall standard." *D-Link*,

773 F.3d at 1232.  Therefore, fact-finders must not only separate the patented

technology from the product, but also the patented technology from the standard.

Only "if a patentee can show that [its] invention makes up 'the entire value of the'

standard" is it entitled to claim the entire value of standardization.  *Id.* at 1233.

## SUMMARY OF ARGUMENT

HTC has argued for a rigid SSPPU rule for SEP licenses that would exclude

most market-based evidence from the jury's consideration of a "reasonable royalty."

There is no requirement under contract or patent law requiring any particular royalty

---

[8] A Petition for Certiorari has been filed in *Time Warner Cable*.  Supreme Court
Docket No. 19-211.  This brief is not intended to address the merits of this petition
or views of the United States on that matter.

structure or valuation methodology for SEPs—there is no requirement that licenses

be tied to a component.  HTC also appears to argue that any license term which

disadvantages one firm against its competitors by, *inter alia*, "imposing different costs"

is discriminatory.  But virtually any license structure can impose "different costs to

different competitors," which may have a disparate impact on some firms.  To the

extent HTC is advocating that non-discrimination requires the same license structure

for all similarly-situated licensees, HTC's rule is untenable and giving its non-

discrimination jury instruction would be error.  Any jury instruction should preserve

the ability of parties to enter into licenses that meet their business needs in different

contexts.

Adopting either of HTC's rules would damage licensing markets.  HTC's rules

would substitute the judgment of courts and juries for the most knowledgeable parties

regarding the value of patented technology, hamstring parties trying to craft complex

licensing agreements, and potentially disrupt existing licenses.  In short, it would

undermine the SEP licensing market and the incentives to innovate that Congress has

created with our patent system.

## ARGUMENT

## I.    HTC Misstates the Law on Apportionment

### A.    Apportionment can be satisfied by market evidence

In FRAND disputes, where courts are tasked with determining whether a

licensing royalty offer is "reasonable," courts may find guidance from, among other

things, how the term "reasonable royalty" has been interpreted under the Patent Act. *See* discussion *supra* pp.12-13. Accordingly, as in the patent damages context, a SEP owner can demonstrate that an offer is FRAND by showing what others have agreed to in comparable licenses, and, if necessary, offering testimony regarding the differences between the situation of past licenses and the case at bar. *See D-Link*, 773 F.3d at 1227. Contrary to HTC's suggestions, neither patent damages law—including the doctrine of apportionment—nor contract law require more. Other methods of proving a reasonable royalty are permissible, and subject to particular rules to ensure proper apportionment, but apportionment is "already built in" to market-based evidence, such as licenses. *CSIRO*, 809 F.3d at 1303; *supra* discussion pp. 16-17.

HTC's suggestions that FRAND licenses cannot be "premised on the full … value of a product," or "tied to the full price of HTC's smartphones" and must "start[] from … subcomponents" are wrong. Br. 34-36. No appellate court has adopted such a rule and the Federal Circuit has explicitly rejected it. *Supra* discussion pp. 16-17. ETSI's agreement expresses "no specific preference for any licensing model." *See* Director General Statement, *supra* note 4. Moreover, in patent infringement cases, the Federal Circuit has affirmed using the end product as a royalty base when licensing evidence demonstrates that "sophisticated parties routinely" do so. *Exmark*, 879 F.3d at 1349 (internal alteration omitted); *see also LaserDynamics*, 694 F.3d at 79-80; *Fujifilm*, 605 F.3d at 1372-73. Indeed, HTC seems to concede as much by not pursuing its SSPPU-specific jury instructions on appeal. *See* Br. 37.

To be relevant, past licenses must be comparable, but need not be so in every respect. HTC's objections go to the weight of the evidence presented to the jury, but "it is well-understood that [the] process [of calculating patent damages] may involve some degree of approximation and uncertainty." *Virnetx*, 767 F.3d at 1328; *D-Link*, 773 F.3d at 1233. The reasonability and comparability of past licenses are "factual issue[s] best addressed by cross examination" not *per se* rules. *Virnetx*, 767 F.3d at 1331; *see also D-Link*, 773 F.3d at 1227-28. Consequently, juries charged with adjudicating FRAND disputes should be told about the specifics of the SEP owner's FRAND commitment. *D-Link*, 773 F.3d at 1235. Juries should also be told that a reasonable royalty is one that pays for the use of the technology, not the value of standardization, or other factors. *Id.* When licensing evidence is at issue, juries should be instructed to consider differences between the circumstances leading to those licenses and the case before them. *Id.* Thus, a general apportionment and FRAND instruction may be appropriate, but it would be error for the district court to instruct a jury that FRAND agreements must take a particular form or that such agreements must use a component-based royalty.

## B. Requiring component-based royalties is contrary to sound innovation policy

If adopted by this Court, HTC's contentions regarding SSPPU and EMVR would transform those doctrines from tools for controlling jury awards for patent damages into a required baseline for all SEP-licensing negotiations. The sophisticated

parties that enter SEP licenses choose end-device royalties for important business reasons, such as simplifying negotiations. These parties also understand that any royalty amount can be achieved using a component base or an end product base. *Id.* at 1227. Indeed, SSPPU and EMVR are typically applied in the absence of any actual licensing agreement between the patent holder and the infringer, as a means of estimating what the parties to a hypothetical licensing agreement may have agreed to. *See Lucent*, 580 F.3d at 1325 ("The hypothetical negotiation tries, as best as possible, to recreate the *ex ante* licensing negotiation scenario and to describe the resulting agreement."). These rules are not meant to preclude the parties to an actual licensing agreement from contracting on different terms if they perceive that to be in their interests. Nor do they suggest that a SEP holder's proposed licensing terms are per se unreasonable for FRAND purposes if those terms incorporate a different base for calculating royalties. Consequently, a rigid SSPPU rule would not only be contrary to law, which seeks to "avoid rote reference to any particular damages formula" in SEP cases, *D-Link*, 773 F.3d at 1232, but also for several reasons could seriously impair licensing markets without achieving any discernable benefit.

First, any rigid contracting rule requiring a direct link between components and a SEP license could make licensing negotiations far more cumbersome. SSPPU and EMVR were developed in the context of patent litigation, which generally involves one suit, brought in one jurisdiction, by one party, on one patent (or at most a handful of patents) that covers one component to one product. *See id.* at 1226-27. By

contrast, SEP licenses often take years to negotiate and cover hundreds or thousands
of patents in numerous jurisdictions across the world that read on numerous
components and potentially a manufacturer's entire product line.  Many parties
streamline negotiations by using portfolio-wide licenses paid either as a lump-sum or
running royalty, based on the sale of end devices.  *See* Dkt.538 at 7.  HTC's approach
would deprive them of that option.  Indeed, requiring component-based royalties for
SEPs may force parties to negotiate patent-by-patent and component-by-component
across hundreds or thousands of patents as they apply to numerous products and
potentially thousands of components.  *Supra* notes 6-7.  And using SSPPU licensing
may require parties to renegotiate licenses as the components or devices are
redesigned.  These additional steps in the negotiations are likely to be laborious and
increase the areas of conflict, when, as here, the parties disagree about which SEPs
cover which components.  *See* Dkt.538 at 8-9.

Second, imposing a judicial mandate for component-based licenses may require
SEP holders to renegotiate or litigate existing agreements.  Many SEP owners have
already entered agreements using end-device royalties.  *Supra* notes 6-7.  If such
agreements are not FRAND, existing licensees may not only request component-
based licenses going forward, but also demand to renegotiate existing licenses or
demand repayment of royalties already paid, as HTC did here.  Dkt.136 at 33.  Thus,
HTC's rule may not only make licensing markets less efficient going forward, but may
also upend existing licensing rights.

Third, HTC's rule, effectively requiring a particular royalty structure, would interfere with the parties' ability to craft agreements that meet their business needs. How parties structure royalties are business decisions that allocate risks and incentives among the parties. *See* Nimmer & Dodd, *supra* note 7. For example, a cash-rich licensee may prefer an up-front lump-sum royalty, and a cash-poor one may prefer a royalty based on future sales. Furthermore, a licensee may prefer to provide the licensor with its advertised price for its products than a potentially sensitive price at which it procures components. In the wireless SEP market, many parties have chosen not to use component-based royalties. *See* Stasik, *supra* note 6. The law does not, and should not, disrupt that practice by dictating the parties' choice of license structure. *See D-Link*, 773 F.3d at 1227; *cf. LaserDynamics*, 694 F.3d at 79-80.

Fourth, HTC's approach not only could impair the licensing market, but also could make SEP litigation more uncertain. If this Court holds that only licenses that use an SSPPU royalty base are FRAND, it "would necessitate [the] exclusion" of licenses that don't meet that requirement and may "make it impossible for a patentee to resort to license-based evidence." *CSIRO*, 809 F.3d at 1303-04; *D-Link*, 773 F.3d at 1228. If end-device licenses are deemed *per se* not FRAND, then they cannot be evidence in court of what a FRAND royalty is. *See id.* Thus, even though the market has established a price for many SEPs (using an end device royalty base), HTC's rule would leave juries to guess at a technology's value as if no market had ever valued it. The result will be less accurate and less predictable judgments in SEP cases.

Finally, HTC's proposed rule could further disrupt innovation incentives by providing the potential for antitrust liability. Some courts (incorrectly) have allowed antitrust claims to proceed on the basis that breaches of FRAND commitments give rise to antitrust liability. *See, e.g., u-blox AG v. InterDigital, Inc.,* No.:3-19-cv-001-CAB-(BLM), 2019 WL 1574322 (S.D. Cal. April 11, 2019). If the court adopts a rule that FRAND requires SSPPU to be used as the royalty base, all FRAND licenses that do not follow this model could be subject to antitrust challenge and possibly treble damages.

## II.   HTC's Proposed Non-Discrimination Instruction Would Create Error

According to HTC, a license term violates FRAND's non-discrimination provision if it puts one firm at a "competitive disadvantage" or "imposes different costs" on competitors. Dkt.464-1 at 17-19. To be sure, a FRAND non-discrimination commitment requires treating like parties alike, on the whole. However, the instruction that HTC advances is contrary to the flexible intent of ETSI's FRAND policy and, if adopted by this Court as a rule of law, may unduly restrict SEP-licensing markets.

No circuit court has had occasion to analyze a FRAND non-discrimination claim in detail,[9] but statements from ETSI and the history of ETSI's IP policy indicate

---

[9] One case raising FRAND discrimination issues is currently on appeal to the Federal Circuit. *TCL Communication Technology v. Telefonaktiebolaget LM, Ericsson*, Fed. Cir. Nos. 18-1363, 18-1732, 18-1380, & 18-1382.

that it does not seek to impose particular license terms as HTC's instruction could be read to suggest. ETSI itself has said that it has "no specific preference for any licensing model" and that specific licensing terms are "commercial issues" among the parties in which ETSI does not involve itself. Director General Statement, *supra* note 4; *Guide on Intellectual Property Rights* § 4.1, *supra* note 4. ETSI experimented with requiring SEP owners to offer particular terms to licensees through its most-favored-licensee policy, but long ago returned to its intentionally non-specific approach. Contreras, *supra* note 5. Likewise, the EU Commission—ETSI is a European organization and the ETSI contract is governed by French law—has said that "FRAND is not one-size-fits-all" and that "solutions can differ … depending on the business models in question." European Commission, *supra* at 7. Forbidding SEP owners from entering any license that would put another licensee at a "competitive disadvantage" or that would "impose[] different costs" on different licensees is contrary to this intentional flexibility. Doing so would also present serious practical difficulties.

Numerous ordinary—and even necessary—licensing terms, at least when taken in isolation, inherently "impose[] different costs [on] different competitors" by allocating risks and transaction costs in different ways according to the needs of the parties. Dkt.464-1 at 17-19. For example, most licenses are structured with either a lump-sum royalty or a running royalty. *Supra* notes 6-7. Lump-sum licenses may be favored by established firms with a large sales base, because such firms are more likely

to have cash available to pay immediately and can spread out the cost of the license over a greater sales volume. *See* Nimmer & Dodd, *supra* note 7. Such licenses also give licensors a guaranteed immediate payment, for which they may be willing to compromise on other terms. *Id.* By contrast, a running royalty may benefit a less established firm, which may want to delay royalty payments into the future and pay a smaller royalty if sales are lower than anticipated. *Id.* Such licenses also require licensors to bear the risk of future non-payment or lower sales volume and the cost of ensuring ongoing compliance, for which a licensor may demand compensation. *Id.*

Other license terms also may have disparate impacts, when taken in isolation, but could simply reflect the parties' compromises to meet complex business needs in varying situations. For example, running royalties based on sales price can favor manufactures of less expensive devices and put the risk of price changes on the licensor. A fixed per-unit running royalty can favor manufacturers of more expensive devices and put the risk of price changes on the licensee. Similarly, some parties may be willing to enter long-term agreements, which reduce the transaction costs of repeated negotiations. Others may demand shorter terms for flexibility. Some licensees may have valuable cross-licenses or other non-monetary compensation to offer, others may not. Even requiring a royalty payment in dollars can have a disparate impact, by putting the risk of currency fluctuations on a licensee who operates in non-U.S. markets.

It is not clear how HTC would resolve the inequality inherent in virtually any choice of license structure, except by rigidly requiring licensors to use precisely the same structure for all licensees.  As even HTC acknowledges, SEP licenses are complex transactions with numerous terms that involve compromises by the parties. *See* Dkt.537 at 9.  A bargain reached in one context may not be easily compared with one reached in another.  Any jury instruction should reflect that complexity and preserve the ability of parties to enter into licenses that meet their business needs in different contexts.

## III.   SSOs and Individual Parties May Use Component-Based Royalties or Specify FRAND Obligations in Appropriate Cases

The United States takes no position here on the appropriateness of any particular royalty structure to any particular situation or on an SSO specifying the FRAND obligation, including with a component-based royalty rule or particular non-discrimination clause.  SSOs and parties can tailor their terms to specific technologies and industries and allow for experimentation with different terms more easily than can courts or governments.

## CONCLUSION

For the foregoing reasons, this Court should not adopt a rule that would unnecessarily limit the use of licensing evidence in FRAND disputes or require FRAND licenses to take a particular form.

Respectfully submitted,

/s/ Michael F. Murray

THOMAS W. KRAUSE
*Solicitor*
NICHOLAS T. MATICH
*Senior Legal Advisor to the Under Secretary*
*and Director*
MEREDITH H. SCHOENFELD
KAKOLI CAPRIHAN
*Associate Solicitors*

*United States Patent and Trademark Office*
*Mail Stop 8, P.O. Box 1450*
*Alexandria, Virginia 22313*
*(571) 272-9035*

MAKAN DELRAHIM
*Assistant Attorney General*
MICHAEL F. MURRAY
*Deputy Assistant Attorney General*
WILLIAM J. RINNER
*Chief of Staff and Senior Counsel*
DANIEL E. HAAR
JENNIFER M. DIXTON
*Attorneys*
*United States Department of Justice*
*Antitrust Division*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 353-3100*

*Counsel for the United States of America*

October 30, 2019

27

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 29(a)(4)(G) and Fed. R. App. P. 32(g)(1), I certify that this brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) and Fed. R. App. P. 32(a)(7)(B) because, excluding the parts exempted by Fed. R. App. P. 32(f), this brief contains 6442 words.

I further certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because the brief has been prepared in Microsoft Office Word 2016 using 14-point Garamond font, a proportionally spaced typeface.

October 30, 2019                              /s/ Michael F. Murray
                                             *Counsel for the United States*

## CERTIFICATE OF SERVICE

I hereby certify that on October 30, 2019, I electronically filed the foregoing

brief with the Clerk of the Court for the United States Court of Appeals for the Fifth

Circuit by using the appellate CM/ECF filer system. Participants in the case are

registered CM/ECF users, and service will be accomplished by the appellate

CM/ECF system.


October 30, 2019                    /s/ Michael F. Murray

                                     *Counsel for the United States*