No. 19-40566

## IN THE

# 𝔘𝔫𝔦𝔱𝔢𝔡 𝔖𝔱𝔞𝔱𝔢𝔰 𝔆𝔬𝔲𝔯𝔱 𝔬𝔣 𝔄𝔭𝔭𝔢𝔞𝔩𝔰

## FOR THE FIFTH CIRCUIT

CONSOLIDATED WITH: 19-40643

HTC CORPORATION; HTC AMERICA, INCORPORATED,

*Plaintiffs-Appellants*,

v.

TELEFONAKTIEBOLAGET LM ERICSSON; ERICSSON, INCORPORATED,

*Defendants-Appellees*.

On Appeal from the United States District Court
for the Eastern District of Texas
No. 6:18-CV-00243-JRG

---

### REDACTED BRIEF FOR DEFENDANTS-APPELLEES
### TELEFONAKTIEBOLAGET LM ERICSSON
### AND ERICSSON, INCORPORATED

---

Theodore Stevenson, III
  *Counsel of Record*
Nicholas Mathews
Chelsea Priest
MCKOOL SMITH, P.C.
300 Crescent Court, Suite 1500
Dallas, TX 75201
(214) 978-4000

Jeffrey A. Lamken
Rayiner I. Hashem
Benjamin T. Sirolly
MOLOLAMKEN LLP
The Watergate, Suite 660
600 New Hampshire Avenue, N.W.
Washington, D.C. 20037
(202) 556-2000

*Counsel for Defendants-Appellees*
*Telefonaktiebolaget LM Ericsson and Ericsson, Incorporated*

*(Additional Counsel Listed on Inside Cover)*

Charles E. Fowler, Jr.
MCKOOL SMITH, P.C.
300 W. 6th Street, Suite 1700
Austin, TX  78701
(512) 692-8700

Samuel Franklin Baxter
MCKOOL SMITH, P.C.
104 E. Houston Street, Suite 300
Marshall, TX  75670
(903) 923-9000

Blake H. Bailey
MCKOOL SMITH, P.C.
600 Travis Street, Suite 7000
Houston, TX  77002
(713) 485-7300

*Counsel for Defendants-Appellees*

No. 19-40566

IN THE

# United States Court of Appeals

## FOR THE FIFTH CIRCUIT

CONSOLIDATED WITH: 19-40643

HTC CORPORATION; HTC AMERICA, INCORPORATED,

*Plaintiffs-Appellants,*

v.

TELEFONAKTIEBOLAGET LM ERICSSON; ERICSSON, INCORPORATED,

*Defendants-Appellees.*

On Appeal from the United States District Court
for the Eastern District of Texas
No. 6:18-CV-00243-JRG

---

## CERTIFICATE OF INTERESTED PERSONS

---

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

**Plaintiffs-Appellants HTC Corporation and HTC America, Incorporated.**

Counsel for Plaintiffs-Appellants:

T. Andrew Culbert
PERKINS COIE LLP
1201 Third Avenue, Suite 4900
Seattle, WA 98101
Phone: (206) 359-8000
E-mail: ACulbert@perkinscoie.com

i

David Chiappetta
PERKINS COIE LLP
505 Howard Street, Suite 1000
San Francisco, CA  94105
Phone: (415) 344-7076
E-mail: DChiappetta@perkinscoie.com

Kristine Beaudoin
PERKINS COIE LLP
2901 N. Central Avenue, Suite 2000
Phoenix, AZ  85012
Phone: (602) 351-8395
E-mail: KBeaudoin@perkinscoie.com

Andrew T. Dufresne
PERKINS COIE LLP
33 E. Main Street, Suite 201
Madison, WI  53703
Phone: (608) 663-7460
E-mail: ADufresne@perkinscoie.com

Jennifer Haltom Doan
HALTOM & DOAN
6500 Summerhill Road, Suite 100
Texarkana, TX  75503
Phone: (903) 255-1000
E-mail: jdoan@haltomdoan.com

Susan E. Foster
PERKINS COIE LLP
1201 Third Avenue, Suite 4900
Seattle, WA  98101
Phone: (206) 359-8000
E-mail: SFoster@perkinscoie.com

Adam G. Hester
PERKINS COIE LLP
3150 Porter Drive
Palo Alto, CA  94304
Phone: (650) 838-4311
E-mail: AHester@perkinscoie.com

Andrew N. Klein
PERKINS COIE LLP
3150 Porter Drive
Palo Alto, CA  94304
Phone: (650) 838-4409
E-mail: AKlein@perkinscoie.com

Dan L. Bagatell
PERKINS COIE LLP
3 Weatherby Road
Hanover, NH  03755
Phone: (202) 654-3327
E-mail: DBagatell@perkinscoie.com

David J. Burman
PERKINS COIE LLP
1201 Third Avenue, Suite 4900
Seattle, WA  98101
Phone: (206) 359-8426
E-mail: DBurman@perkinscoie.com

Jessica Everett-Garcia
PERKINS COIE LLP
2901 N. Central Avenue, Suite 2000
Phoenix, AZ  85012
Phone: (602) 351-9165
E-mail: JEverettgarcia@perkinscoie.com

Jonathan R. Putman
PERKINS COIE LLP
1201 Third Avenue, Suite 4900
Seattle, WA 98101
Phone: (206) 359-3895
E-mail: JPutman@perkinscoie.com

Joseph E. Bringman
PERKINS COIE LLP
1201 Third Avenue, Suite 4900
Seattle, WA 98101
Phone: (206) 359-8000
E-mail: JBringman@perkinscoie.com

Kevin A. Zeck
PERKINS COIE LLP
1201 Third Avenue, Suite 4900
Seattle, WA 98101
Phone: (206) 359-3002
E-mail: KZeck@perkinscoie.com

Laura K. Hennessey
Formerly with PERKINS COIE LLP
1201 Third Avenue, Suite 4900
Seattle, WA 98101

Shylah R. Alfonso
PERKINS COIE LLP
1201 Third Avenue, Suite 4900
Seattle, WA 98101
Phone: (206) 359-8000
E-mail: SAlfonso@perkinscoie.com

Thomas N. Millikan
PERKINS COIE LLP
11452 El Camino Real, Suite 300
San Diego, CA 92130
Phone: (858) 720-5700
E-mail: TMillikan@perkinscoie.com

Cole A. Riddell
HALTOM & DOAN
6500 Summerhill Road, Suite 100
Texarkana, TX  75503
Phone: (903) 255-1000
E-mail: criddell@haltomdoan.com

Joshua R. Thane
HALTOM & DOAN
6500 Summerhill Road, Suite 100
Texarkana, TX  75503
Phone: (903) 255-1000
E-mail: jthane@haltomdoan.com

James C. Yoon
WILSON SONSINI GOODRICH & ROSATI
650 Page Mill Road
Palo Alto, CA  94304
Phone: (650) 493-9300
E-mail: jyoon@wsgr.com

Olivia M. Kim
WILSON SONSINI GOODRICH & ROSATI
633 W. Fifth Street, Suite 1550
Los Angeles, CA  90071
Phone: (323) 210-2904
E-mail: okim@wsgr.com

Martin R. Bader
SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
12275 El Camino Real, Suite 200
San Diego, CA  92130
Phone: (858) 720-8900
E-mail: mbader@sheppardmullin.com

Matthew W. Holder
SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
12275 El Camino Real, Suite 200
San Diego, CA  92130
Phone: (858) 720-7411
E-mail: mholder@sheppardmullin.com

Stephen S. Korniczky
SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
12275 El Camino Real, Suite 200
San Diego, CA  92130
Phone: (858) 720-8900
E-mail: skorniczky@sheppardmullin.com

**Defendants-Appellees Telefonaktiebolaget LM Ericsson and Ericsson, Incorporated.**

(1)    Telefonaktiebolaget LM Ericsson has no parent corporation, and no publicly held corporation owns more than 10% of its stock.

(2)    The following publicly held corporations are parent corporations or own 10% or more of the stock of Ericsson, Incorporated: Ericsson Holding II Inc. and Telefonaktiebolaget LM Ericsson

Counsel for Defendants-Appellees:

> Laurie LaVigna Fitzgerald
> Formerly with MCKOOL SMITH, P.C.
> 300 W. 6th Street, Suite 1700
> Austin, TX  78701
>
> Nicholas Mathews
> MCKOOL SMITH, P.C.
> 300 Crescent Court, Suite 1500
> Dallas, TX  75201
> Phone: (214) 978-4914
> E-mail: nmathews@mckoolsmith.com
>
> Theodore Stevenson, III
> MCKOOL SMITH, P.C.
> 300 Crescent Court, Suite 1500
> Dallas, TX  75201
> Phone: (214) 978-4974
> E-mail: tstevenson@mckoolsmith.com
>
> Jeffrey A. Lamken
> MOLOLAMKEN LLP
> The Watergate, Suite 660
> 600 New Hampshire Avenue, N.W.
> Washington, D.C.  20037
> Phone: (202) 556-2010
> E-mail: jlamken@mololamken.com

Blake H. Bailey
MCKOOL SMITH, P.C.
600 Travis Street, Suite 7000
Houston, TX  77002
Phone: (713) 485-7300
E-mail: bbailey@mckoolsmith.com

Charles E. Fowler, Jr.
MCKOOL SMITH, P.C.
300 Crescent Court, Suite 1500
Dallas, TX  75201
Phone: (214) 978-6361
E-mail: cfowler@mckoolsmith.com

Chelsea Priest
MCKOOL SMITH, P.C.
300 Crescent Court, Suite 1500
Dallas, TX  75201
Phone: (214) 978-6363
E-mail: cpriest@mckoolsmith.com

Christine Michelle Woodin
MCKOOL SMITH, P.C.
300 W. 6th Street, Suite 1700
Austin, TX  78701
Phone: (512) 692-8750
E-mail: cwoodin@mckoolsmith.com

Erik Bruce Fountain
MCKOOL SMITH, P.C.
300 Crescent Court, Suite 1500
Dallas, TX  75201
Phone: (214) 978-4000
E-mail: efountain@mckoolsmith.com

Frank Charles Vecella
MCKOOL SMITH, P.C.
300 Crescent Court, Suite 1500
Dallas, TX 75201
Phone: (214) 978-4000
E-mail: fvecella@mckoolsmith.com

Jonathan Nathanial Powers
MCKOOL SMITH, P.C.
300 Crescent Court, Suite 1500
Dallas, TX 75201
Phone: (214) 978-4088
E-mail: jpowers@mckoolsmith.com

Kevin Lee Burgess
MCKOOL SMITH, P.C.
300 W. 6th Street, Suite 1700
Austin, TX 78701
Phone: (512) 692-8704
E-mail: kburgess@mckoolsmith.com

Kevin Hess
MCKOOL SMITH, P.C.
300 W. 6th Street, Suite 1700
Austin, TX 78701
Phone: (512) 692-8749
E-mail: khess@mckoolsmith.com

Marcus Lewis Rabinowitz
MCKOOL SMITH, P.C.
300 Crescent Court, Suite 1500
Dallas, TX 75201
Phone: (214) 978-4074
E-mail: mrabinowitz@mckoolsmith.com

Rayiner I. Hashem
MOLOLAMKEN LLP
The Watergate, Suite 660
600 New Hampshire Avenue, N.W.
Washington, D.C.  20037
Phone: (202) 556-2024
E-mail: rhashem@mololamken.com

Benjamin T. Sirolly
MOLOLAMKEN LLP
The Watergate, Suite 660
600 New Hampshire Avenue, N.W.
Washington, D.C.  20037
Phone: (202) 556-2023
E-mail: btsirolly@mololamken.com

Samuel Franklin Baxter
MCKOOL SMITH, P.C.
104 E. Houston Street, Suite 300
Marshall, TX  75670
Phone: (903) 923-9000
E-mail: sbaxter@mckoolsmith.com

Warren Henry Lipschitz
MCKOOL SMITH, P.C.
300 Crescent Court, Suite 1500
Dallas, TX  75201
Phone: (214) 978-4973
E-mail: wlipschitz@mckoolsmith.com

Respectfully submitted,

*/s/ Theodore Stevenson, III*
Theodore Stevenson, III
Counsel of Record

## STATEMENT REGARDING ORAL ARGUMENT

Telefonaktiebolaget LM Ericsson and Ericsson, Inc. (collectively, "Ericsson") request oral argument. The issues in the case are complex and the underlying trial record is considerable.

# TABLE OF CONTENTS

Page

CERTIFICATE OF INTERESTED PERSONS ......................................................... i

STATEMENT REGARDING ORAL ARGUMENT ............................................ xi

STATEMENT OF THE CASE................................................................................1

I.     The Standards-Development Process ...........................................................1

       A.    The European Telecommunications Standards Institute
             ("ETSI") ...........................................................................................2

       B.    Ericsson ............................................................................................2

       C.    The Contractual Framework Governing Patented
             Technology Incorporated into ETSI Standards................................3

             1.    The ETSI IPR Policy and FRAND Commitment......................3

             2.    ETSI's Decision To Leave FRAND Undefined ........................3

             3.    Current Market-Based Approach to FRAND ............................5

II.    Ericsson and HTC's Licensing Relationship...................................................6

       A.    HTC's Prior Ericsson Licenses ...........................................................6

       B.    The Current Dispute .........................................................................7

III.   Proceedings Below ........................................................................................8

       A.    HTC's Breach-of-Contract Suit .........................................................8

       B.    Pre-Trial Proceedings........................................................................8

             1.    The Parties Agree That French Law Governs the
                   ETSI Contract ..........................................................................8

       2.      The District Court Rejects HTC's SSPPU Theory as Not Required by the French-Law FRAND Obligation...................................................................9

   C.   Trial ...........................................................................11

       1.      Ericsson's Comparable-License Evidence...............................11

       2.      Evidence of ETSI's Intent and Industry Practice ....................13

       3.      HTC's Methodology ....................................................14

       4.      The Non-Discrimination Evidence ...........................................16

   D.   Jury Instructions ................................................................18

   E.   The Jury Verdict and Declaratory Judgment ......................................19

SUMMARY OF ARGUMENT .................................................................20

ARGUMENT ...............................................................................22

I.    The District Court Did Not Err in Refusing To Give the Jury Instructions HTC Now Demands .................................................................22

   A.   HTC Waived Any Argument That Its U.S. Law Instructions Are Required in This Action for Breach of a French-Law Contract..........................................................25

       1.      HTC Proffered No Evidence of ETSI Intent To Support Its Proposed Instructions ...........................................26

       2.      HTC Forfeited Any Argument the Instructions Were "Incomplete" or Should Have Addressed Particular Issues .......................................................30

       3.      HTC Invited Any Supposed Error by Endorsing the Approach It Now Challenges..............................................31

   B.   The District Court Correctly Instructed the Jury on the Law Governing HTC's Breach-of-Contract Claim............................33

C.    HTC's Proposed Apportionment Instructions Were
      Superfluous Regardless ..........................................................39

D.    HTC's Proposed Instructions Were Incorrect ....................................43

      1.    Apportionment Instructions ........................................................43

      2.    Non-Discrimination Instructions ...............................................46

II.   Substantial Evidence Supports the Jury's Finding That
      Ericsson's Offers Were FRAND ..............................................................48

A.    HTC's Challenge to the Verdict Is Waived ........................................48

B.    Ample Evidence Supported the Verdict..............................................49

      1.    Ample Evidence Supports the Finding That
            Ericsson's Offers Did Not Discriminate ...................................49

      2.    Ericsson's Offers Were Fair and Reasonable ...........................54

      3.    The Jury Was Entitled To Reject HTC's Proposed
            Definition of Non-Discrimination ............................................55

III.  The District Court Properly Excluded Expert Opinions From
      Other Trials..............................................................................................56

A.    The Opinions Were Inadmissible Hearsay..........................................56

B.    The District Court's Ruling Is Not Reversible Error .........................59

CONCLUSION ......................................................................................................61

# TABLE OF AUTHORITIES

Page(s)

### CASES

*Antero Res. Corp. v. S. Jersey Res. Grp., LLC*,
  933 F.3d 1209 (10th Cir. 2019) ...............................................26, 34, 40

*Bank One, Tex., N.A. v. Taylor*,
  970 F.2d 16 (5th Cir. 1992) ..................................................................33

*Bender v. Brumley*,
  1 F.3d 271 (5th Cir. 1993) ...................................................................24

*Brennan v. Norton*,
  350 F.3d 399 (3d Cir. 2003) ................................................................27

*Brown v. Bryan Cty.*,
  219 F.3d 450 (5th Cir. 2000) ...............................................................49

*Burns v. Travelers Ins. Co.*,
  344 F.2d 70 (5th Cir. 1965) .................................................................43

*Chernack v. Radlo*,
  331 F.2d 170 (1st Cir. 1964).................................................................31

*Collins v. Wayne Corp.*,
  621 F.2d 777 (5th Cir. 1980) ..........................................................57, 58

*Coughlin v. Capitol Cement Co.*,
  571 F.2d 290 (5th Cir. 1978) ...............................................................49

*CSIRO v. Cisco Sys., Inc.*, 809 F.3d 1295
  (Fed. Cir. 2015)................................................................38, 40, 42, 46

*Dear v. Q Club Hotel, LLC*,
  933 F.3d 1286 (11th Cir. 2019) ...........................................................34

*Ericsson, Inc. v. D-Link Sys., Inc.*,
  773 F.3d 1201 (Fed. Cir. 2014) ......................................................44, 45

*In re Fairchild Aircraft Corp.*,
  6 F.3d 1119 (5th Cir. 1993) ........................................................27, 30

*Fox v. Taylor Diving & Salvage Co.*,
  694 F.2d 1349 (5th Cir. 1983) ....................................................58, 59

*Fractus, S.A. v. AT&T Mobility LLC*,
  2:18-cv-00135, 2019 U.S. Dist. LEXIS 169610
  (E.D. Tex. Sep. 30, 2019) ...................................................................57

*In re Hanford Nuclear Reservation Litig.*,
  534 F.3d 986 (9th Cir. 2008) .............................................................57

*Int'l Ins. Co. v. RSR Corp.*,
  426 F.3d 281 (5th Cir. 2005) .............................................................28

*Jefferson Block 24 Oil & Gas, LLC v. Aspen Ins. UK Ltd.*,
  652 F.3d 584 (5th Cir. 2011) .............................................................26

*Jimenez v. Wood Cty., Tex.*,
  660 F.3d 841 (5th Cir. 2011) (en banc) ............................................29

*Johnson v. William C. Ellis & Sons Iron Works, Inc.*,
  609 F.2d 820 (5th Cir. 1980) .............................................................42

*Kanida v. Gulf Coast Med. Pers. LP*,
  363 F.3d 568 (5th Cir. 2004) ........................................................24, 40

*Kirk v. Raymark Indus., Inc.*,
  61 F.3d 147 (3d Cir. 1995) ....................................................56, 57, 59

*Loughan v. Firestone Tire & Rubber Co.*,
  624 F.2d 726 (5th Cir. 1980) .............................................................34

*McBrayer v. Teckla, Inc.*,
  496 F.2d 122 (5th Cir. 1974) .............................................................34

*McCaig v. Wells Fargo Bank (Tex.) N.A.*,
  788 F.3d 463 (5th Cir. 2015) .............................................................32

*McLendon v. Big Lots Stores*,
  749 F.3d 373 (5th Cir. 2014) .............................................................49

*Metallurgical Indus. Inc. v. Fourtek, Inc.*,
    790 F.2d 1195 (5th Cir. 1986) ............................................................59

*Microsoft Corp. v. Motorola, Inc.*,
    795 F.3d 1024 (9th Cir. 2015) .....................................................37, 38

*Navigant Consulting, Inc. v. Wilkinson*,
    508 F.3d 277 (5th Cir. 2007) ............................................................30

*Omnitech Int'l, Inc. v. Clorox Co.*,
    11 F.3d 1316 (5th Cir. 1994) ............................................................49

*OneBeacon Ins. Co. v. T. Wade Welch*,
    841 F.3d 669 (5th Cir. 2016) ............................................................49

*Ortiz v. Jordan*,
    562 U.S. 180 (2011)...........................................................................49

*Palmer v. Hoffman*,
    318 U.S. 109 (1943).....................................................................29, 30

*Rembrandt Wireless Techs., LP v. Samsung Elecs. Co.*,
    853 F.3d 1370 (Fed. Cir. 2017) ........................................................45

*Russell v. Plano Bank & Tr.*,
    130 F.3d 715 (5th Cir. 1997) ............................................................30

*Russell v. Univ. of Tex. of Permian Basin*,
    234 F. App'x 195 (5th Cir. 2007) .....................................................40

*Schilling v. La. Dep't of Transp. & Dev.*,
    662 F. App'x 243 (5th Cir. 2016) .....................................................28

*Sears v. S. Pac. Co.*,
    313 F.2d 498 (9th Cir. 1963) ............................................................31

*TCL Comm. Tech. Holdings, Ltd. v. Telefonaktiebolaget LM Ericsson*,
    No. 15-cv-2370, 2018 WL 4488286 (C.D. Cal. Sept. 14, 2018).......28

*TCL Comm. Tech. Holdings, Ltd. v. Telefonaktiebolaget LM Ericsson*,
    Nos. 18-1363, -1732, -1380, -1382, 2019 WL 6598216
    (Fed. Cir. Dec. 5, 2019) ....................................................................28

*Texas Pig Stands, Inc. v. Hard Rock Cafe Int'l, Inc.*,
    951 F.2d 684 (5th Cir. 1992) ................................................................60

*Theriot v. J. Ray McDermott & Co.*,
    742 F.2d 877 (5th Cir. 1984) ................................................................58

*United States v. Lewis*,
    671 F.2d 1025 (7th Cir. 1982) ..............................................................47

*United States v. Salazar*,
    751 F.3d 326 (5th Cir. 2014) ................................................................33

*United Telecomms., Inc. v. Am. Television & Commc'ns Corp.*,
    536 F.2d 1310 (10th Cir. 1976) ...........................................................34

*VirnetX, Inc. v. Cisco Sys., Inc.*,
    767 F.3d 1308 (Fed. Cir. 2014) ...........................................40, 44, 51

*Wilcox v. Wild Well Control, Inc.*,
    794 F.3d 531 (5th Cir. 2015) ................................................................27

## RULES

Fed. R. Civ. P. 26(a)(2)(B) ....................................................................57

Fed. R. Civ. P. 50 .................................................................19, 22, 49

Fed. R. Civ. P. 50(b) ..............................................................................49

Fed. R. Civ. P. 51 ........................................................................20, 30

Fed. R. Civ. P. 51(b)(1) ..........................................................................29

Fed. R. Civ. P. 51(b)(2) ................................................................19, 29

Fed. R. Civ. P. 51(c)(1) ...........................................................................29

Fed. R. Civ. P. 51(c)(2)(A) .....................................................................29

Fed. R. Evid. 403 ....................................................................................59

Fed. R. Evid. 801(d)(2)(C) ....................................................................56

## OTHER AUTHORITIES

King Fung Tsang & Jyh-An Lee, *Unfriendly Choice of Law in FRAND*, 59 Va. J. Int'l L. 220 (2019) ................................................. 36

9A Wright & Miller, *Federal Practice and Procedure* § 2447 (3d ed. 2018 & Supp. 2019) ................................................. 28

30B Wright & Miller, *Federal Practice and Procedure* § 6775 (2018 ed. & Supp. 2019) .......................................................... 57

## **STATEMENT OF THE CASE**

A leading innovator in the cellular-communications industry, Ericsson holds myriad patents for trailblazing technologies that, for example, increase data speeds and enhance battery life for mobile phones. The European Telecommunications Standards Institute ("ETSI"), which developed "3G," "4G," and "5G" cellular-communications standards, included many patented Ericsson technologies in those standards. A longtime ETSI member, Ericsson made a binding promise—a contractual commitment—to license those patents on "fair, reasonable and non-discriminatory" ("FRAND") terms.

This case arises from HTC's claim that Ericsson breached that contract. HTC makes cellular handsets. It asserts that Ericsson broke its promise by failing to offer HTC rates that were a small fraction of what any other prior licensee, including HTC itself, had agreed to pay. After a full trial, the jury and the district court alike rejected HTC's position.

## I.    **The Standards-Development Process**

Modern cell phones offer tremendous capabilities, such as web browsing, downloading apps, and streaming. To enable such capabilities and seamless interoperability, the industry developed technical standards (like 3G, 4G, and 5G) that specify how cell phones and towers operate, incorporating innovative technologies for fast, reliable, and secure communications.

1

### A.    The European Telecommunications Standards Institute ("ETSI")

ETSI is a standards-development organization founded in 1988 and head-quartered in France.  ROA.20505.  ETSI developed the 3G, 4G, and 5G cellular-communications standards.  Its more than 800 members include phone makers, infrastructure (cell-tower) equipment makers, carriers, and universities. ROA.20505.  ETSI may be the "most important standards-developing organization in the mobile telecommunication field."  ROA.10572.

ETSI standards are developed by committees of engineers from ETSI members.  ROA.20508-11; ROA.10515-21.  They closely examine technical pro-posals to adopt the "best technical solutions" for each part of the standard. ROA.10573.  ETSI members invest thousands of person-years and billions of dollars in each version of the standard.  *See* ROA.10572-73.

### B.    Ericsson

Founded in 1876, Ericsson is headquartered in Stockholm, Sweden, with major operations in Plano, Texas.  It employs over 100,000 people, and is a leading manufacturer of cellular base stations.  Dedicating more than 23,000 employees and $3.5 billion annually to R&D efforts, Ericsson developed many foundational technologies that connect smartphones and other mobile devices, enable seamless use, and provide increased performance and new features.  ROA.11021.  Erics-son's R&D has produced over 45,000 patents globally.  ROA.9938.  A long-

2

standing ETSI participant, Ericsson has contributed technologies from thousands of Ericsson patents to ETSI standards.

### C.    The Contractual Framework Governing Patented Technology Incorporated into ETSI Standards

Because ETSI adopts the "best technical solutions," its standards often incorporate patented technologies.  ROA.10573.  Patents covering such technologies are called standard-essential patents ("SEPs") because standard-compliant devices necessarily use (and infringe) the patents.  ROA.10573.  This case arises from the contractual SEP-licensing obligations in ETSI's Intellectual Property Rights ("IPR") Policy.  ROA.35147.

#### 1.    *The ETSI IPR Policy and FRAND Commitment*

ETSI's IPR Policy requires members that own patents essential to an ETSI standard to file declarations about use of their patents.  Patent owners can voluntarily agree that they are "prepared to grant irrevocable licenses" to such patents on "fair, reasonable and non-discriminatory" terms (the "FRAND commitment").  ROA.35147-48; *see* ROA.20519.  Otherwise, ETSI may exclude the technology from the standard.  The IPR Policy and FRAND commitment are French-law contracts between ETSI and its members.  ROA.35152; ROA.10579-80.

#### 2.    *ETSI's Decision To Leave FRAND Undefined*

The term "fair, reasonable and non-discriminatory" was left deliberately undefined to promote flexibility.  ROA.20544.  The current version of the FRAND

commitment was preceded by the rigid—and short-lived—1993 version. ROA.10582-84.  That earlier version included seventeen restrictions on FRAND licenses.  ROA.20517-18.  For example, only monetary consideration was permitted; licensees could terminate contracts any time, but licensors could terminate only on breach; geographic restrictions applied; and disputes had to be arbitrated. ROA.20517-18.  The 1993 version also had a "most-favored licensee provision" allowing licensees to "re-open" existing licenses if they believed another licensee obtained a better rate.  ROA.20539; *see* ROA.10582-84.

The 1993 version was panned.  ROA.10582-85.  The European Commission deemed it "not feasible or appropriate" to impose such specificity "as to what constitutes 'fairness' or 'reasonableness' since these are subjective factors determined by the circumstances surrounding the negotiation."  ROA.20527.  The U.S. Department of State criticized it as a "major departure from accepted international standard-setting practices."  ROA.20556; *see* ROA.10583.  Companies complained that it "depart[ed] significantly from accepted international standards practices." ROA.20556-58; *see* ROA.10583.  Motorola warned it would force Motorola's withdrawal from ETSI.  ROA.20556-57.

Stakeholders urged a "simple, flexible approach[]" in place of rigid rules. ROA.20557.  As IBM explained, "market forces" and reliance on "consensual" licensing negotiations would produce "fair and adequate royalt[ies]."  ROA.20555.

4

### 3.     Current Market-Based Approach to FRAND

In 1994, ETSI replaced the ill-fated 1993 proposal with the current language, which reflects the flexible approach advocated by stakeholders.  ROA.20558-61. The 1994 commitment relies on the words "fair," "reasonable," and "non-discriminatory"—without further elaboration—"to afford private parties wide latitude to fashion licensing practices and terms that fit their individual circumstances."  ROA.20559-60.  The current version "stays away . . . from disallowing specific licensing structures [and] procedures," ROA.10586, employing a "case-by-case determination" that "allows parties . . . to find their own interpretation of 'fair and reasonable'" without *per se* rules about "concrete terms," ROA.20527.

ETSI has repeatedly rejected proposals to further define "fair, reasonable and non-discriminatory" or insert requirements into the contract.  ROA.10598-600. It rejected a proposal to specify "FRAND bad practices."  ROA.20561.  It also rejected a  proposal to adopt an "aggregated reasonable terms and proportionality" approach, under which a total royalty rate would be set for all technologies in the standard, to be divided among essential patent holders.  ROA.20562; *see* ROA.20528-30, 20561-62 (other rejected proposals).

5

## II.   Ericsson and HTC's Licensing Relationship

### A.   HTC's Prior Ericsson Licenses

Headquartered in Taoyuan City, Taiwan, with operations in Seattle, Washington, HTC began selling mobile phones in the early 2000s.  Its sales peaked in 2011 at 45 million phones (well behind Apple's and Samsung's hundreds of millions).  After 2011, HTC's sales dropped precipitously, to 2 million handsets in 2018.

Ericsson and HTC entered into their first license in 2003.  Under that five-year license, HTC received rights to Ericsson's 2G technology for royalties of

███████████████████████████████████████████████████████

█████████████████████████████████████████████   ROA.40291-304.  When that license was amended in 2006 to encompass Ericsson's 3G technologies, HTC agreed to pay ████████████████████████████████

███████████████████████████████████████████████████████

████████████   ROA.42731-43.  After one extension in 2008, that license expired in 2013.  ROA.11471.

Ericsson and HTC executed their first 4G license in 2014.  Facing steep sales declines since 2011, HTC requested a shorter term.  ROA.11472.  The parties agreed to ████████████████████████████ under which HTC paid ███████████

6

████████████████████████████████████████████████████

███████████████████████████████████. ROA.11606-07; ROA.10915.

**B.    The Current Dispute**

████████████████████████████████████████████████████

████████████████████████████████    In view of HTC's changed

circumstances—including falling sales, an uncertain future, and rumors of a sale of

HTC's handset division to Google—Ericsson offered to renew the 2014 license at

a rate of $2.50 per 4G smartphone.    ROA.10665.    ████████████████████

████████████████████████████████    ROA.10663-64.

HTC countered with an offer of $0.10 per handset—"so far off of the norm"

from HTC's prior licenses, and Ericsson's licenses with other companies, that

Ericsson was taken aback.    ROA.10668-69.    When the parties met, HTC argued

that, despite its prior licenses and industry practice, FRAND royalties cannot be

calculated as a percentage of handset price.    ROA.10678-79.    It insisted that

royalties be based on the ***profit margin*** on ***one component*** of the phone—the so-

called Smallest Salable Patent-Practicing Unit ("SSPPU")—which HTC identified

as the phone's baseband processor.    Ericsson countered that HTC was legally

wrong and that its proposal had never been adopted in the industry.    Ericsson

promised a detailed rebuttal.    ROA.10679.    Just days after the meeting, however,

HTC filed this lawsuit.    ROA.72.

### III.    Proceedings Below

#### A.    HTC's Breach-of-Contract Suit

HTC's complaint alleged that HTC is a third-party beneficiary to the ETSI contract.  ROA.88.  HTC sought, among other things, a declaration that Ericsson had breached the contractual obligation to grant it licenses on FRAND terms. ROA.72-98.  HTC claimed that royalties must be calculated using the profit margin on baseband processors.  ROA.94-95.  HTC also alleged that Ericsson failed to negotiate in good faith.  ROA.3144.[1]

Ericsson counterclaimed for a declaration that its offers were FRAND and an injunction requiring HTC to enter into a license at the offered rates.  ROA.3145-46.  Ericsson alleged that HTC failed to negotiate in good faith.  ROA.3146.

During the lawsuit, Ericsson made a second offer to HTC, with a royalty of either (i) $2.50 per 4G device (Ericsson's earlier offer); or (ii) 1% of the net-sales-price of each 4G device, with a $1.00 floor and $4.00 cap.  ROA.10680.

#### B.    Pre-Trial Proceedings

##### 1.    *The Parties Agree That French Law Governs the ETSI Contract*

Before trial, the parties agreed that "French law governs the interpretation and application of the ETSI IPR Policy."  ROA.6259 (HTC); *see* ROA.5532 (Ericsson).  The parties correspondingly agreed that U.S. patent-damages law does

---

[1] HTC amended its complaint twice, adding claims the district court later referred to arbitration.  ROA.3144-45.  HTC does not appeal that ruling.

not define FRAND's requirements. As HTC urged, "arguments based on U.S. law are irrelevant" because the "IPR Policy is governed by French law." ROA.17712.

The parties likewise agreed that the scope of FRAND obligations and any methodologies for calculating FRAND rates were contractual matters under French law (not issues under U.S. patent law). "[D]etermining the FRAND rate for a license," HTC urged, is an "issue of contract interpretation." ROA.5409.

Because the ETSI contract does not define FRAND, the parties agreed that the term and its application would be decided in light of French rules of contract interpretation, including extrinsic evidence. For example, urging that "experts are not in universal agreement about what FRAND means," HTC sought to present evidence of "economic theories about how FRAND should be interpreted." ROA.6747; *see* ROA.5461 (Ericsson agreeing that determining FRAND is "like construing an ambiguous contract" based on "extrinsic evidence").

> 2. *The District Court Rejects HTC's SSPPU Theory as Not Required by the French-Law FRAND Obligation*

HTC's central position in district court was that FRAND requires calculating royalties in a particular way—as a percentage of the profit margin of one component of the phone, the "baseband processor" (the alleged SSPPU). ROA.15997. Ericsson moved for a ruling that the ETSI contract, under French law, does not require an SSPPU methodology. ROA.17125-27. Ericsson offered extensive extrinsic evidence of ETSI's intent, ROA.17175-91 (Huber), industry

practice, ROA.17186-87, as well as declarations addressing French law, ROA.17150-60 (Borghetti), and patent law in various countries, ROA.17192-218 (Kesan); *see* ROA.17116-311. HTC offered no evidence of ETSI's intent or industry practice, but submitted declarations from economists and its French-law experts. *See* ROA.17775-97.

While HTC insisted that "a French court . . . would likely determine that the [ETSI] Policy implicitly requires SSPPU or other type of apportionment pricing," ROA.6052, HTC contended the issue was for the jury. Whether "ETSI's FRAND provisions impose a requirement to use an apportionment methodology" like SSPPU, HTC asserted, is a "fact-intensive issue" for "trial." ROA.28741. HTC did not argue that patent law, as opposed to contract interpretation, was at issue. Indeed, responding to Ericsson's argument that HTC had misread U.S. patent-damages precedent, HTC argued U.S. patent cases are "irrelevant to determinations of French law." ROA.17712.

The district court granted Ericsson's motion. It first ruled on governing law. "The FRAND commitment," it held, "is governed by the laws of France" and is "solely contractual in nature." ROA.2886. A dispute about FRAND's requirements, such as "whether [it] requires a royalty to be based on the SSPPU," thus "raises a question of French contract interpretation." ROA.2886.

Applying French contract-interpretation rules, the court found "that the terms 'fair, reasonable, and non-discriminatory' are not 'clear and unambiguous.'" ROA.2890.  Consistent with French law, the court looked to evidence of ETSI's intent and "general industry practice."  ROA.2890-91.  Invoking that evidence, the district court held that, "as a matter of French law, the FRAND commitment . . . does not require a FRAND license to be based on the SSPPU."  ROA.2893.  It held that "whether a license meets the requirements of FRAND will depend on the particular *facts* of the case, as there is no prescribed methodology for calculating a FRAND license."  ROA.2893 (emphasis added).  HTC has not appealed that ruling.  It has abandoned its main theory below—that licenses must be calculated as a percentage of SSPPU profits.

## C.    Trial

At trial, Ericsson presented extensive evidence that its offers to HTC were reasonable and non-discriminatory based on actual, negotiated licenses and industry practice.  HTC argued that, although it was "not aware" of even "one" voluntary license that expressed royalty rates as a percentage of baseband-processor (the alleged SSPPU) profits, ROA.10407, the jury should adopt that method.

### 1.    *Ericsson's Comparable-License Evidence*

Ericsson presented comparable licenses from █████████████████████████ ████████████████████████, showing they had agreed to royalty terms

11

similar to those Ericsson offered HTC.  ROA.39929-31; ROA.11559-75.  Ericsson

had offered HTC royalty rates based on the entire phone—specifically, 1% of the

net-selling price of each unit, with a $1.00 floor and $4.00 cap (or, alternatively,

$2.50 per unit).



ROA.11612-22.

The experts agreed that FRAND royalties must reflect the value the patented

inventions add to the phones, not the value of unrelated features or standardization.

HTC's Dr. Perryman testified that a "fair and reasonable rate" is one that "fully

compensates [the patentee] for the value of their technology but not for the value

of someone else's technology or the value that just comes from just being a part of

the standard itself."  ROA.10445.

Ericsson's Mr. Mills concurred, explaining that "the best way" to value

patented technologies, which is to examine the royalties agreed upon in

comparable licenses, reflects only the value the patented technology adds, not unrelated features.  ROA.10727-29.  The market, he explained, comprises "very sophisticated parties."  ROA.10728.  Ericsson's licensees are usually ETSI members involved in standards-development, with first-hand knowledge of Ericsson's contributions.  ROA.10472-73; ROA.10728.  The years-long technical negotiations included engineers, lawyers, and licensing professionals.  ROA.10728.  Those "sophisticated parties," engaged in intense negotiations, "recognize that Ericsson should be compensated for the value it brings, . . . ***not*** the value of other functionality that's unrelated to its patents."  ROA.10729 (emphasis added).

### 2.    *Evidence of ETSI's Intent and Industry Practice*

Ericsson's Dr. Huber personally participated in ETSI's drafting of the FRAND commitment.  ROA.10568, 10576.  He explained that the FRAND obligation is highly fact-dependent.  ETSI, he observed, deliberately left FRAND undefined because determining whether a rate is FRAND "requires taking into account all relevant circumstances."  ROA.10586.  ETSI had tried to impose rules before, but had abandoned that approach and resisted attempts to further define FRAND.  *See* pp. 3-5, *supra*.  Ericsson's corporate representative testified to

Ericsson's understanding of the ETSI contract it had entered into.[2]  HTC provided

no evidence regarding contracting-party intent.

Dr. Huber testified that it was a "standard practice" for ETSI members to

"calculate royalties based on the price of an end-user device like a phone rather

than on a component within the device."  ROA.10587.  That was "standard

industry practice" both when "ETSI adopted its IPR policy in 1994" and "today."

ROA.10587.  By contrast, HTC's expert admitted he was "not aware of one" real-

world license based on the SSPPU baseband-processor-profit methodology HTC

championed.  ROA.10407.

### 3.    *HTC's Methodology*

HTC took a different approach to the trial.  HTC did not seek to estimate the

value that Ericsson's technology contributed, or how much other licensees had

agreed to pay.  HTC started with the profit margin on a baseband processor, one

small component of the smartphone.  ROA.10844.  HTC then calculated the

fraction of the processor's "[s]ilicon area" used for cellular functionality,

ROA.10176, and multiplied the profit margin by that fraction.  HTC urged that the

resulting figure—$0.19-1.22 per phone—reflected the total value of ***all*** cellular

---

[2] FRAND "requires us," she stated, "to provide access to everyone that wants to
produce phones and base stations."  ROA.11442-43.  Ericsson "cannot charge such
a high rate that in effect that would be like denying somebody a license."
ROA.11443.  Nor can Ericsson "discriminate [against] anyone . . . because they are
from a different country . . . or they're not ETSI members."  ROA.11443.

technology for the *entire* industry.  ROA.10404.  Under HTC's "top-down" model, Ericsson was entitled to 5-7% of that value, because (according to HTC) Ericsson had 5-7% of the patents essential to 2G, 3G, and 4G.  That produced a royalty of $0.01-0.08 per phone.  ROA.10807.

On cross-examination, HTC's expert conceded he could identify no voluntary license agreement that calculated royalties as he had, ROA.10407, or any licensee that had paid Ericsson a royalty of just $0.01-0.08 per handset. ROA.10807-16.  Ericsson's witnesses explained why it made no sense for royalties to be based on the profit margin of a particular chip.  For example, many Ericsson patents relate to the whole phone, not the baseband processor alone.  ROA.10615.

HTC's analysis led to absurd results.  For example, HTC placed the value of cellular technology at $0.19 to $1.22 per phone.  But Apple charged ***$350 more*** for an iPhone with 4G than for an otherwise identical iPod with WiFi.  ROA.10732-34; *see* ROA.10735-37 (tablets with 4G $100 more than tablets with only WiFi). Customer surveys showed that buyers valued the advances embodied in 4G, over the slower 3G predecessor, at $131.  ROA.10739.[3]

HTC presented no evidence that its royalty calculation, based on the profit margin from a portion of a single component of the phone (the putative SSPPU), reflected the intent of the contracting parties or industry practice.  *See* p. 14, *supra.*

---

[3] The transcript incorrectly reads "$1.31," but Mr. Mills stated $131.  *See* ROA.21024.

Instead, HTC relied on Dr. Perryman, who purported to explain contemporary economists' perspective on FRAND. ROA.10392-430. He testified that FRAND must be construed to avoid giving essential patent owners "too much bargaining power." ROA.10395.

### 4. The Non-Discrimination Evidence

The jury heard ample evidence of non-discrimination, including the rates paid by licensees situated similarly to 

ROA.11613-20; pp. 11-12, *supra*.

. ROA.11620-22.

ROA.11612-22.

Christina Petersson, Ericsson's corporate representative, surveyed each HTC competitor and explained why ███████████████████████████████ ███████████████████████████ ROA.11559-75. Dr. Huber testified that, like FRAND generally, the non-discrimination requirement was meant to be capacious and flexible. ROA.10586. It ensures that non-European and non-ETSI members would not be precluded from implementing the standard, but does not require all competitors to receive identical rates. ROA.10586-88. Rather, FRAND always allows for a range. ROA.10587, 10886.

HTC insisted (without presenting any evidence of ETSI's intent) that "every company in an industry [must] basically get the same deal." ROA.10397. That was the lynchpin of HTC's discrimination case, which compared HTC to companies with large, strategic cross-licensing deals—giving Ericsson access to their technologies—that made large up-front payments, and had vastly different sales volumes. For example, HTC invoked ████████████████████ ███████████████████████████████████ ███████████████████████ ROA.11402-03. ██████████████████ ███████████████████████████████████

ROA.10898, 10574.

Ericsson's witnesses emphasized that FRAND is not a most-favored-licensee clause and does not require identical treatment, especially for such

drastically dissimilar circumstances. Ericsson's Mr. Mills testified that HTC would not suffer any competitive disadvantage by paying the offered royalties. ROA.10740.

### D. Jury Instructions

At the close of evidence, the court conducted a charge conference. In contrast to its current position, HTC proposed instructing the jury that "there is no prescribed methodology" for determining FRAND rates:

> Whether a license meets the requirements of FRAND will depend on the particular facts of the case, as there is no prescribed methodology for calculating a FRAND license.

ROA.32315. The district court gave a substantively indistinguishable instruction: "Whether or not a license is FRAND," the court explained, "will depend upon the totality of the particular facts and circumstances existing during the negotiations and leading up to the license," as "there is no fixed or required methodology for setting or calculating the terms of a FRAND license rate." ROA.11017.

HTC proposed thirteen other instructions, many spanning multiple para-graphs. ROA.32315-23. HTC purported to invoke U.S. patent-infringement damages cases, but offered no briefing why those instructions reflected the contracting-parties' intent. HTC objected to Ericsson's proposed instructions that royalties should be "based on the value of the patent holder's patented invention(s), not any additional value solely attributable to the standard's adoption of the patent-

18

ed invention(s)." ROA.32325-26; *see* ROA.32323, 32325 (objecting to instruction stating that the jury "may consider the royalty rates paid by other companies situated similarly to HTC").

When the district court invited "any possible objections" to its proposed jury charge, ROA.10858; *see* Fed. R. Civ. P. 51(b)(2), HTC never objected that the court's instructions were "incomplete" or lacked sufficient direction on apportionment or non-discrimination. HTC reiterated its list of requested instructions, referencing them by name and number, while offering no explanation why those instructions were required by the ETSI contract or French contract interpretation. ROA.10864. The court overruled HTC's objections. ROA.10864-65.

### E. The Jury Verdict and Declaratory Judgment

The jury found that Ericsson's offers complied with its FRAND commitment. ROA.3147. The jury also found that neither side negotiated in good faith. ROA.3147. HTC made no post-verdict Rule 50 motion.

Consistent with the verdict, the district court issued a declaration that Ericsson had offered HTC a license on FRAND terms. ROA.35072. The court also explained that, "even in the absence of this verdict, the Court's review of the evidence submitted would have led it to conclude that Ericsson complied with its FRAND assurance to HTC." ROA.35064.

19

# SUMMARY OF ARGUMENT

**I.A.**  HTC waived its challenge to the jury charge.  HTC's breach of contract claims are governed by French contract law, and the scope of the obligation to grant "fair, reasonable and non-discriminatory" ("FRAND") terms is a matter of "French contract interpretation."  ROA.2886-87.  Because the contract does not define FRAND, its meaning must be determined through extrinsic evidence, such as the parties' intent and industry practice.  HTC, however, offered no such evidence below to support the constructions of the contract reflected in its proposed instructions.

HTC now argues the instructions were "incomplete" and left the jury "adrift."  But HTC failed to satisfy Rule 51's requirements.  It never explained why its instructions were essential, or objected that the court's charge was "incomplete" (or anything similar).  Indeed, HTC proposed the substance of one instruction it now challenges, and objected to the instructions that, on appeal, it says were necessary.

**B.**  The jury was properly charged with respect to the contract claims before it.  No one disputes that the jury charge correctly addressed governing contract issues.  The district court was not required to further define "FRAND" or explain how to calculate a FRAND rate—things ETSI deliberately left undefined.  Rather, it properly tasked the jury with applying the contract language based on

extrinsic evidence. The court was not required to give HTC's reticulated instructions, reflecting HTC's view of U.S. patent-damages law, to a contract addressing licensing for thousands of patents from numerous jurisdictions.

C.    HTC retreats from the specific instructions it requested below, to simply urging that more guidance on particular topics (such as apportionment) was needed. The district court was not required to give the scaled-back guidance or instructions that HTC demands for the first time on appeal. Any such instructions would have been superfluous. Nobody disputed at trial that the FRAND royalty must reflect patent value, apart from the value of other features or standardization itself. Both parties' experts repeatedly invoked those principles. HTC nowhere challenges the admission of valuation evidence on the grounds that it was not properly apportioned. HTC never even argues that Ericsson's comparable-license evidence was not apportioned. HTC can show no conceivable prejudice.

D.    Finally, HTC's proposed instructions were incorrect and confusing. The law does not require a separate instruction demanding "reliable" "evidence" that offers are "apportioned." HTC's apportionment instructions suggested to the jury, incorrectly, that they were required to value the patented invention in isolation, rather than assessing the value it *adds* as part of the completed product. HTC's argumentative non-discrimination instruction was erroneous, parroting HTC's disputed expert testimony.

21

**II.**    HTC's sufficiency-of-the-evidence challenge to the declaratory judgment is waived.  HTC failed to file a post-trial motion for judgment as a matter of law under Rule 50.  Regardless, ample comparable-license evidence, comparing the rates paid by HTC's competitors, showed that Ericsson's offers were FRAND.

**III.**    The district court properly rejected HTC's efforts to pre-admit thousands of pages of hearsay expert reports from other litigation.  As the district court held, absent a special showing, independent experts are presumed to offer independent testimony and are not agents of the parties that retain them.  HTC made no such showing here.  HTC suffered no prejudice regardless.

## **ARGUMENT**

## I.    **The District Court Did Not Err in Refusing To Give the Jury Instructions HTC Now Demands**

HTC alleges that Ericsson breached a French-law contract—the commitment to ETSI that it would be prepared to grant licenses on FRAND terms.  The district court ruled that obligation is "solely contractual in nature," and its meaning is determined through "French contract interpretation" rules.  ROA.2886.  HTC does not appeal that ruling.  To the contrary, HTC insisted below that French contract law governs, arguing French courts would impose HTC's preferred methodology—that royalties be calculated using the smallest salable patent-practicing unit ("SSPPU").  *See* ROA.6052 ("French court[s] . . . would likely determine that the Policy implicitly requires SSPPU or other type of apportionment pricing . . . .");

22

ROA.32319; *cf.* U.S. Br. 9.  The trial court rejected HTC's position.  "[A]s a matter of French law," it ruled, "the FRAND commitment . . . does not require a FRAND license to be based on the SSPPU."  ROA.2893.  HTC does not challenge that ruling either.

So HTC now demands a new trial under a different theory.  HTC argues that the jury needed additional guidance on FRAND principles—based on U.S. patent-law damages cases—because the instructions given were not "complet[e]."  HTC Br. 24.  Those arguments are waived and unmeritorious.  This case concerns the requirements of a French contract.  While HTC now invokes U.S. patent-damages cases as controlling, it told the district court that "arguments based on U.S. law are irrelevant" because the FRAND commitment "is governed by French law."  ROA.17712.  HTC presented no evidence to the trial court that the contracting parties—ETSI and Ericsson—intended U.S. damages-law precedent to control FRAND licensing for patent rights issued around the globe.  While HTC retreats to the position that the district court should at least have given guidance on certain "apportionment" principles, that argument is waived.  HTC never objected that the district court's instructions were "incomplete" or misleading, and it never made the scaled-back request it raises on appeal.  Indeed, HTC ***proposed*** essentially the jury instruction it attacks on appeal, and ***objected*** to the instructions

it now says, at a minimum, were required. HTC, moreover, could not have been prejudiced, because the principles it pressed were undisputed.

The district court's instructions were correct regardless. Under both French and American law, undefined contract terms are left for the factfinder to apply using extrinsic evidence, like the contracting parties' intent, the drafters' stated goals, and industry practice. Here, ETSI and its members deliberately left the key term at issue—"FRAND"—undefined to permit flexible application. There was no evidence, and the district court certainly was not required to find as a matter of law, that the parties to the ETSI agreement intended that all licenses for global technologies reflect HTC's thirteen prolix proposed jury instructions. HTC's proposed instructions were erroneous in any event.

Standard of Review. This Court reviews refusal of requested jury instructions for abuse of discretion, affording district courts "wide latitude." *See Bender v. Brumley*, 1 F.3d 271, 276 (5th Cir. 1993). District courts are not required to instruct on every conceivable matter, and abuse their discretion only where the rejected instruction (1) was a "'substantially correct statement of law'"; (2) was "'not substantially covered in the charge as a whole'"; and (3) "'concerned an important point in the trial such that the failure to instruct . . . seriously impaired the party's ability to present a given claim.'" *Kanida v. Gulf Coast Med. Pers. LP*,

24

363 F.3d 568, 578 (5th Cir. 2004).  Absent a proper objection, this Court (at most) reviews under the rigorous plain-error standard.  *Id.* at 581.

### A.    HTC Waived Any Argument That Its U.S. Law Instructions Are Required in This Action for Breach of a French-Law Contract

The district court ruled that the ETSI "FRAND commitment . . . is governed by the laws of France, and is solely contractual in nature."  ROA.2886.  The contours of what the "FRAND commitment requires" thus is a matter of "French contract interpretation."  ROA.2886.  HTC agreed below:  "French law," it urged, "governs the interpretation and application of the ETSI IPR Policy."  ROA.21053.  "[D]etermining the FRAND rate," thus is "an issue of contract interpretation."  ROA.5409.  HTC thus declared that the "methodology" for determining "whether a proposed royalty is FRAND," ROA.5410, how one calculates "what Ericsson's SEPs are worth," ROA.6752, and the "meaning of 'similarly situated' for deter-mining a non-discriminatory royalty" are all "fundamentally" issues "of contract interpretation," ROA.5410-11.  HTC demanded an SSPPU methodology because (in its view) "a French court . . . would likely determine that the [ETSI] Policy im-plicitly requires SSPPU or" something similar.  ROA.6052.  HTC similarly characterized "arguments based on U.S. law" as "irrelevant" because the ETSI contract "is governed by French law."  ROA.17712.

Invoking U.S. patent-law damages cases, HTC now insists the district court was required to give various proposed instructions.  But HTC did not offer the

25

proof required to justify those instructions as a matter of "French contract interpretation." Nor does it attempt to do so here. It failed to properly object that such instructions were necessary under the contract. Indeed, HTC invited the very course the district court followed.

> 1.    *HTC Proffered No Evidence of ETSI Intent To Support Its Proposed Instructions*

The district court ruled—and HTC does not dispute—that FRAND lacks a "clear and unambiguous" meaning. ROA.2890. Consequently, under French and American law alike, the factfinder construes the terms based on evidence of "the parties' common intentions" and the "prevailing industry standard or approach." ROA.2890, 2892; *see Antero Res. Corp. v. S. Jersey Res. Grp., LLC*, 933 F.3d 1209, 1218-19 (10th Cir. 2019). As HTC insisted, the content of "ETSI's FRAND provisions" is a "fact-intensive issue" for "trial." ROA.28741. Accordingly, to obtain an instruction on the contract's requirements, HTC had to "prove that its proposed interpretation . . . is the correct one" based on "extrinsic evidence . . . so one-sided that no reasonable person could decide the contrary." *Jefferson Block 24 Oil & Gas, LLC v. Aspen Ins. UK Ltd.*, 652 F.3d 584, 589 (5th Cir. 2011).

HTC presented ***thirteen*** lengthy proposed instructions purporting to address apportionment and non-discrimination. ROA.32315-23. But HTC never identified ***evidence*** that the contracting parties, ETSI and Ericsson, intended FRAND to incorporate those proposals. Nor did HTC invoke industry practice. It cited no

Case: 19-40566    Document: 124-2    Page: 48    Date Filed: 12/06/2019

basis for concluding that ETSI had chosen to superimpose HTC's view of U.S. patent-damages law to govern licenses for patents issued around the world. The sole evidence of ETSI's intent and industry practice showed otherwise. *See* pp. 13-14, *supra*.

HTC was well aware that French law governed, since at least the trial court's January 7, 2019 choice-of-law ruling. ROA.2886. But HTC's proposed jury instructions, submitted three weeks later, invoked U.S. cases, HTC's experts' declarations, and articles. ROA.32314-23. HTC never explained how its citations were relevant to an alleged breach of a French-law contract. ROA.32314-23. Even the vague theories HTC now offers (at 32-33)—that U.S. patent law reaches out to govern reasonable royalties for global portfolios of patents from myriad jurisdictions—appeared nowhere. HTC thus failed to "'alert the district court'" of any such arguments and preserve them for appeal. *Brennan v. Norton*, 350 F.3d 399, 418 (3d Cir. 2003). "Citing cases that may contain a useful argument is simply inadequate to preserve that argument for appeal; 'to be preserved, an argument must be pressed, and not merely intimated.'" *In re Fairchild Aircraft Corp.*, 6 F.3d 1119, 1128 (5th Cir. 1993), *abrogation on other grounds recognized by Wilcox v. Wild Well Control, Inc.*, 794 F.3d 531 (5th Cir. 2015).

HTC sidesteps its evidentiary default by characterizing Federal Circuit patent cases as controlling law. HTC Br. 24; *see id.* at 25 ("[e]stablished rules");

27

*id.* at 28 ("legal requirements"); *id.* at 30-31 ("established law"). But this is a contract case governed by "French contract interpretation," ROA.2886, not a patent case. HTC thus conceded below that "U.S. law [is] irrelevant," as the FRAND determination "is governed by French law." ROA.17712.

Even on appeal, HTC makes no effort to show that the ETSI contract, interpreted under French legal principles, incorporates the requirements set forth in HTC's lengthy proposed instructions. HTC's opening brief does not address French law at all. That alone dooms its appeal. *See Int'l Ins. Co. v. RSR Corp.*, 426 F.3d 281, 292 (5th Cir. 2005) ("Having failed to consider or discuss the jury instruction at issue in relation to Texas law, International is not in a position to demonstrate error[.]").[4] Certainly, HTC should not be permitted to develop a novel

---

[4] Insofar as HTC attempts to invoke the (now-vacated) decision in *TCL Communication Technology Holdings, Ltd. v. Telefonaktiebolaget LM Ericsson*, No. 15-cv-2370, 2018 WL 4488286, (C.D. Cal. Sept. 14, 2018), as proof of the contract's meaning, HTC never made that argument to the district court. Regardless, *TCL* construed the contract based on the extrinsic record evidence before it. The district court was not obligated to instruct the jury in light of out-of-circuit determinations by a different fact-finder, based on a different record, and which have since been vacated in their entirety, Nos. 18-1363, *et al.*, 2019 WL 6598216, at *7 n.6 (Fed. Cir. Dec. 5, 2019). *See Schilling v. La. Dep't of Transp. & Dev.*, 662 F. App'x 243, 246 (5th Cir. 2016) (denying instruction "drawn from out-of-circuit decisions"). Finally, in *TCL*, the court and the parties relied on U.S. law for certain principles, because no one disputed them or presented evidence of governing French law on those points. *See* 9A Wright & Miller, *Federal Practice & Procedure* § 2447 (3d ed. 2018 & Supp. 2019); Ericsson Br. 39-40 & n.4 in Nos. 18-1363, *et al.* (Fed. Cir.). Here, the parties disputed the principles underlying HTC's proposed instructions, and Ericsson presented French-law evidence in

theory about the meaning of the French-law ETSI contract for the first time on appeal—much less for the first time in a reply brief.

Rule 51(c)(1) requires parties to make objections to jury instructions "sufficiently specific to bring into focus the precise nature" of any "alleged errors." *Palmer v. Hoffman*, 318 U.S. 109, 119 (1943). The objections must be made once the court "inform[s] the parties of its proposed instructions" and gives them "an opportunity to object on the record." Fed. R. Civ. P. 51(b)(1)-(2), (c)(2)(A). Submitting a proposed jury instruction is thus insufficient. Parties must object to *the court's* proposed instructions, setting out "distinctly the matter objected to and the grounds for the objection." Fed. R. Civ. P. 51(c)(1); *see Jimenez v. Wood Cty., Tex.*, 660 F.3d 841, 844-45 (5th Cir. 2011) (en banc).

Here the district court provided its proposed instructions and invited "any possible objections." ROA.10858. But HTC never stated the grounds for objecting to omission of its proposed instructions. It never explained why, in its view, its *thirteen multi-paragraph* proposed instructions were essential or mandated as a matter of contract construction. HTC just listed out the omitted instructions by number and title (*e.g.*, "No. 2F, FRAND," "No. 2G, fair and reasonable royalty, other licenses"), adding "and these are all based upon the authorities set forth" in HTC's proposed instructions. ROA.10863-64. This Court has long held such

---

support of its view. *See* pp. 8-11, *supra*. Moreover, HTC's proposed instructions go far beyond the findings in *TCL*.

general objections "insufficient to satisfy Rule 51." *Russell v. Plano Bank & Tr.*, 130 F.3d 715, 719 (5th Cir. 1997); *see Navigant Consulting, Inc. v. Wilkinson*, 508 F.3d 277, 295 (5th Cir. 2007) (waiver where appellants failed to "state the grounds for their objection" as the "district court was never given a chance to address th[e] issue"); *Fairchild*, 6 F.3d at 1128.

Likewise, HTC never once mentioned the argument—now central to its appeal—that the district court's jury charge, taken as a whole, was not "complete" or left the jury "adrift" and "without guardrails." HTC Br. 24, 26, 31-39. It never suggested that, without its instructions, the jury might be misled about how to evaluate what constitutes a reasonable royalty. ROA.10858-64. HTC's objections fell miles from being "sufficiently specific" to alert the district court of "the precise nature of the alleged error." *Palmer*, 318 U.S. at 119. Indeed, HTC failed to raise any contention about completeness at all.

      2.      *HTC Forfeited Any Argument the Instructions Were "Incomplete" or Should Have Addressed Particular Issues*

Those same forfeitures doom HTC's attempts to scale back from its lengthy proposed instructions to challenging the absence of "instructions on apportionment and valuation . . . generally." HTC Br. 37; *see* HTC Br. 41-42 (conceding discretion "to provide less detail than HTC's proposed instruction"). HTC insists (at 27-29) the jury should have been instructed to limit reasonable royalties to the value the patented feature adds to the product, and to separate that "from the value of the

standard as a whole," or from value added by standardization and other features. *See* HTC Br. 30 (royalty should reflect "incremental value that the . . . patented invention(s) add to the products"); HTC Br. 32 ("need to separate the value of an SEP from the value of the broader standard and the value of standardization"). Without those instructions, HTC urges, the jury was left "adrift" and "without guardrails." HTC Br. 26, 37.

But HTC never offered that scaled-back request. It identifies no place it urged that the court's instructions needed that additional guidance. Trial courts are not required to "rummage through" numerous lengthy proposed instructions to pick bits and pieces of proffered instructions a party might desire. *Sears v. S. Pac. Co.*, 313 F.2d 498, 505 (9th Cir. 1963); *see Chernack v. Radlo*, 331 F.2d 170, 172 (1st Cir. 1964) (failure to request that instruction be given "in a more limited form" is "poor practice" that does not preserve error). Judges certainly are not required to do so when no party asks, or even suggests that the court's instructions offer insufficient or incomplete guidance.

### 3. HTC Invited Any Supposed Error by Endorsing the Approach It Now Challenges

Regardless, HTC invited the instructions it now challenges. In arguing the instructions were not "complete," HTC excoriates the district court for instructing that "there is no fixed or required methodology" for determining FRAND rates, because such determinations "depend upon the totality of the particular facts and

circumstances." ROA.11017. That instruction, HTC urges, "affirmatively and erroneously told the jury" "that no rules apply to cabin what qualifies as a fair and reasonable royalty." HTC Br. 37.

But HTC proposed essentially that instruction. HTC proposed instructing the jury that "[w]hether a license meets the requirements of FRAND will depend on *the particular facts of the case*, as *there is no prescribed methodology for calculating a FRAND license*." ROA.32315 (emphasis added). The instruction the district court gave is substantively identical, telling the jury that FRAND determinations "*depend upon the totality of the particular facts*," as "*there is no fixed or required methodology*." ROA.11017 (emphasis added). HTC cannot demand a new trial because the district court gave an instruction substantively indistinguishable from one that HTC itself proposed. *Cf. McCaig v. Wells Fargo Bank (Tex.) N.A.*, 788 F.3d 463, 476-77 (5th Cir. 2015) (no relief where party "expressly endorsed the jury question it now complains of").

HTC similarly invokes *Ericsson's* proposed instructions, insisting the jury should have been instructed that royalties are "based on the value of the patent holder's patented invention(s), not any additional value solely attributable to the standard's adoption of the patented invention(s)." HTC Br. 30; *see* pp. 18-19, *supra*. But HTC *objected* to that instruction as "not an accurate statement of law."

ROA.32326 n.85.  That is the essence of invited error, which precludes even plain-error review.  *United States v. Salazar*, 751 F.3d 326, 332 (5th Cir. 2014).

HTC also insists that the jury must be instructed to consider royalties paid by "similarly situated" parties.  HTC Br. 40-41.  ***Ericsson*** proposed instructing the jury that it "may consider the royalty rates paid by other companies similarly situated to HTC."  HTC Br. 41 (citing ROA.32325).  But HTC objected to that instruction too.  ROA.32323 n.79.

### B.    The District Court Correctly Instructed the Jury on the Law Governing HTC's Breach-of-Contract Claim

A jury charge is adequate if it "correctly instructed the jury on controlling law and [was] fundamentally accurate and not misleading."  *Bank One, Tex., N.A. v. Taylor*, 970 F.2d 16, 30 (5th Cir. 1992).  The district court properly instructed the jury on controlling contract law, and correctly allowed the jury to apply the undefined term FRAND based on extrinsic evidence.  No more was required.

1.    The district court properly identified the contract and relevant obligation:  "Ericsson made a commitment to ETSI that it would license its patents essential to the 2G, 3G, and 4G/LTE standards on terms that are fair, reasonable, and non-discriminatory, otherwise known as FRAND terms."  ROA.11017.  Based on HTC's proposed "FRAND" instruction, the district court explained that whether "a license is FRAND will depend upon the totality of the particular facts and circumstances," adding that "there is no fixed or required methodology for setting or

calculating the terms of a FRAND license rate." ROA.11017; p. 18, *supra*. HTC did not object that the district court overlooked relevant contract-law principles.

In contract cases like this one, no more is required. Because FRAND lacks a "clear and unambiguous" meaning, it "must . . . be construed" based on extrinsic evidence such as the "parties' common intentions" and "prevailing industry standard[s]." ROA.2890, 2892. The jury can be assigned that task, as case after case holds. *See McBrayer v. Teckla, Inc.*, 496 F.2d 122, 123 (5th Cir. 1974); *United Telecomms., Inc. v. Am. Television & Commc'ns Corp.*, 536 F.2d 1310, 1319 (10th Cir. 1976) (denying further instruction on "best efforts"); *Dear v. Q Club Hotel, LLC*, 933 F.3d 1286, 1300 (11th Cir. 2019) (jury can apply plain language of "[s]hared costs" based on "circumstances surrounding the making of the contract"); *Antero*, 933 F.3d at 1218-19 (existence of "[d]iscontinuance or unavailability" was for the jury to assess in light of "expectations of the parties" and "industry customs"); *see also Loughan v. Firestone Tire & Rubber Co.*, 624 F.2d 726, 729 (5th Cir. 1980) (forum procedural law governs division of responsibilities between court and jury).

In *Antero*, for example, a gas-delivery contract linked the gas price to a market index, and provided for renegotiation of price upon the index's "discontinuance or unavailability." 933 F.3d at 1216. The parties disputed whether the index had been discontinued or unavailable, which would reduce the gas price, when the

index's publisher created a different index to reflect prices for a certain type of gas transaction. *Id.* at 1216. The Tenth Circuit held that the jury was properly tasked with applying "[d]iscontinuance or unavailability"—without elaboration—based on the "expectations of the parties" and "natural gas industry customs." *Id.* at 1218-19. The district court committed no error in ruling likewise here. Before the trial court, HTC agreed that "questions of what factors are important to fairness, to reasonableness, and to discrimination" "likely will largely be *fact issues for the jury*." ROA.8177 (emphasis added).

2.    Far from reflecting the "expectation of the" contracting parties or "industry customs," HTC's demand for *thirteen multi-paragraph* instructions defied both. Dr. Huber, one of the ETSI contract's drafters, testified that ETSI "[d]eliberately" left FRAND undefined and thus flexible because ETSI intended "good faith negotiations" between sophisticated parties to produce FRAND terms. ROA.10585-86. He testified that HTC's SSPPU approach conflicted with the "standard industry practice" of licensing based on the entire phone. ROA.10587. The jury heard about standard approaches to licensing negotiations and expert testimony that arm's-length negotiations produce FRAND royalty rates. *See* pp. 11-13, *supra*; U.S. Br. 17-19.

ETSI had rejected efforts to impose rigid criteria, preferring a capacious standard to "accommodate a variety of different situations." ROA.10581. That

35

decision "give[s] patent owners and licensees freedom" and "flexibility" to craft structures "that suit their circumstances." U.S. Br. 5, 11. A prior version of the IPR Policy that imposed rigid rules drew "strong opposition," and was replaced with the current market-based approach. ROA.10582-83; pp. 3-5, *supra*. ETSI has repeatedly rejected calls to "more specifically define FRAND." ROA.10589; pp. 4-5, *supra*. Thus, as the district court observed, HTC's effort to impose a series of rules defies "ETSI's affirmative representation that '[t]he basic principle of the ETSI IPR regime remains FRAND with no specific preference for any licensing model.'" ROA.2892. The district court properly declined to write particular definitions into the ETSI agreement contrary to ETSI's own deliberate choice.

3.    HTC complains (at 25) that the district court dispensed with "estab-lished rules govern[ing] evaluation of patent royalties," citing U.S. patent-damages cases. That contradicts HTC's view below that "U.S. law [is] irrelevant" because "ETSI's IPR Policy is governed by French law." ROA.17712. It also ignores the trial court's ruling that FRAND presents questions of "interpretation" of a "French contract" (the ETSI commitment). ROA.2886; *see* U.S. Br. 11 (issue "sounds in contract law, not patent law"). It also overlooks the consensus of other American courts. "Generally, U.S. cases have characterized ... FRAND issues as con-tractual." King Fung Tsang & Jyh-An Lee, *Unfriendly Choice of Law in FRAND*, 59 Va. J. Int'l L. 220, 233, 263 (2019). These issues include the "appropriate

method and royalty base to calculate a FRAND rate." *Id.* at 233.  It also ignores HTC's own opening statement, where it argued that "the rules [of FRAND] you'll apply are straightforward and on the written page."  ROA.9918.

HTC posits (at 32) that U.S. patent law should apply because "the task" faced by a jury assessing a breach-of-contract claim under FRAND "is the same" as in a suit for "patent-infringement damages."  Not so.  U.S. patent-infringement actions involve only U.S. patents.  This case addresses a license to a portfolio comprising thousands of patents from dozens of countries, and offers for blended worldwide rates.  Each country in which Ericsson has patents has its own patent law and various royalty rules.  *See* ROA.17192-218 (surveying patent-damages law).  It is arbitrary to pick U.S. patent-damages law to govern offers for a global patent portfolio, especially where the contract selects French law.

HTC's authorities (at 25-28) are in accord.  *Microsoft Corp. v. Motorola, Inc.*, 795 F.3d 1024, 1040 (9th Cir. 2015), held that a breach-of-contract case involving a RAND commitment "is not a patent law action."  It explained that the "Federal Circuit's patent law methodology can serve as ***guidance*** in contract cases," but nowhere held that royalty calculations are "governed" by U.S. law.  *Id.*

(emphasis added); *see* U.S. Br. 12 (similar).[5]  U.S. patent-damages law does not, by its own force, control contract claims based on a global FRAND commitment.

HTC's reliance on damages cases is misplaced for a second reason:  Those cases do not apply to licensing negotiations.  For example, in *Ericsson Inc. v. D-Link Systems Inc.*, the Federal Circuit explained that, while ***damages models*** in patent-infringement cases often must base royalties on the SSPPU when there are no comparable licenses, real-world "licenses are generally negotiated without consideration" of that evidentiary principle.  773 F.3d 1201, 1226-28 (Fed. Cir. 2014); U.S. Br. 18 (citing cases).  Similarly, *CSIRO v. Cisco Systems, Inc.* held that, while a "damages model" may begin with the SSPPU, that "principle is inapplicable" to licensing where courts assume that "the parties negotiated over the value of the asserted patent[s], 'and no more.'"  809 F.3d 1295, 1302-03 (Fed. Cir. 2015); *see also* U.S. Br. 17-19.  The Federal Circuit has made clear that negotiations for portfolio licenses are different from patent-infringement damages models, and the district court did not err in refusing to superimpose the technical requirements for damages models into an evaluation of licensing negotiations.

---

[5] There is less reason to apply U.S. law here than in *Microsoft*, which involved a RAND commitment governed by New York law.  *See* 795 F.3d at 1031.

### C.    HTC's Proposed Apportionment Instructions Were Superfluous Regardless

Notwithstanding HTC's rhetoric (at 26) about the jury being left "adrift," "without guiding standards," it was well-informed of the principles HTC now invokes.  They were undisputed, and the subject of extensive expert testimony.

For example, no one disputed that FRAND requires "separat[ing] the value of an SEP from the value of the broader standard and the value of standardization." HTC Br. 32.  HTC's opening underscored the need to find "the true value of Ericsson's patents, separate from the value added by the standards" and "all the other functions and features of the entire smartphone."  ROA.9927.  Ericsson's opening promised to prove "what value Ericsson has conferred on the standard." ROA.9947-48.  Ericsson's corporate representative testified that Ericsson was seeking only the value of its patents and that Ericsson is "not entitled to get paid for the standard." ROA.10996.  Both sides' experts agreed.  HTC's Dr. Perryman testified that a "fair and reasonable rate" "compensates the [patentee] *for the value of their technology*, but *not* for the value of *someone else's* technology or the *value that just comes from just being a part of the standard*."  ROA.10445 (emphasis added); *see* ROA.10798.  Ericsson's expert, Mr. Mills, concurred, testifying that comparable licenses demonstrate whether an offer is FRAND because they represent only the value of Ericsson's patents and "*not* the value of other functionality that's unrelated to its patents." ROA.10729 (emphasis added);

*see, e.g.*, ROA.10738-39 (determining "how much of that value is attributable to Ericsson's patents"). Witnesses and counsel referenced the "value" added by the patented technology ***208 times***.

Trial courts are not required to provide superfluous instructions on "undisputed issue[s]" where "nothing prevent[s]" the party "from highlighting [the] issue in . . . argument to the jury." *Kanida*, 363 F.3d at 579; *see Russell v. Univ. of Tex. of Permian Basin*, 234 F. App'x 195, 208 (5th Cir. 2007) (denial of "instruction did not seriously impair" party's "ability to present her case because the jury heard" equivalent "testimony"); *cf. Antero*, 933 F.3d at 1224 (no reversible error where "overwhelming evidence" supported jury verdict).

HTC, moreover, has not challenged the admission of any valuation evidence on apportionment grounds. Ensuring that expert testimony "comport[s] with settled principles of apportionment" is primarily a task for the ***district court*** as "gatekeep[er]" under *Daubert*. *VirnetX, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1328 (Fed. Cir. 2014). HTC does not argue that Ericsson's evidence of the sums paid by comparable licensees—the centerpiece of Ericsson's valuation evidence, *see* pp. 11-13, *supra*—was not apportioned. Nor did it seek to exclude that comparable-license evidence under *Daubert* on apportionment grounds. Such licenses ***are*** necessarily apportioned, because sophisticated negotiators will agree to pay only for the contribution Ericsson's technology makes. *See CSIRO*, 809

40

F.3d at 1302; pp. 12-13, *supra* (citing testimony).  As the United States explains (Br. 15), such "[a]rms-length licensing transactions negotiated by sophisticated parties *directly* reflect the market value of [the] technology."

The dispute at trial was over HTC's SSPPU methodology, not whether apportionment was required:  Everyone agreed royalties must be based on the value the patented technology adds.  The experts' testimony homed in on that. HTC, however, wanted to treat "apportionment" as synonymous with using the "smallest component . . . [as] the basis for the royalty."  *See* pp. 14-15, *supra*.[6]  The district court ruled that the contract does not require licensing based on the SSPPU. ROA.2893.  HTC does not appeal that ruling.

Unwilling to defend any apportionment theory it advanced below, HTC complains that "Ericsson[] argu[ed] that it was entitled to whatever it could extract."  HTC Br. 37.  But Ericsson's lead negotiator testified that FRAND requires looking at "the value that the patent brings to the standard," ROA.10353-54, and "not includ[ing] . . . the fact that it's part of the standard in that valuation process."  ROA.10354.  Ericsson's experts testified likewise.  *See* pp. 12-13, *supra*. HTC offers no contrary citation.  HTC contends (at 36) that "Ericsson presented valuation theories and prior licenses based on the entire value of smartphones . . .

---

[6] *See* ROA.10401 (HTC's expert asserting that SSPPU methodology is "sometimes called an apportionment method because we're not looking at the entire phone"); ROA.10819 ("your way is apportionment, and the other way is on the entire phone, right?").

rather than starting from smaller subcomponents and focusing on the specific patented functions." But licensing based on subcomponent prices (SSPPU) is not required; nor is it industry practice. HTC nowhere appeals the district court's ruling that licenses calculated as a percentage of the price of the entire smartphone are admissible. Any suggestion that Federal Circuit law precludes such evidence, or requires licensing based on the SSPPU, is incorrect. *See CSIRO*, 809 F.3d at 1302; pp. 40-41, *supra*; U.S. Br. 17-19.

HTC's argument (at 34-37) that the jury charge "crippled HTC's ability to present its case" is thus incorrect. There was a wall of unanimous testimony telling the jury that the incremental value added by the patented technology matters—not value added by unrelated features or standardization itself. HTC could and did present its case that Ericsson's offers were not fair and reasonable. *See* pp. 14-16, *supra*. It simply failed to convince the jury.

To show reversible error, moreover, HTC was required to show a "reasonable likelihood that a substantial right was affected." *Johnson v. William C. Ellis & Sons Iron Works, Inc.*, 609 F.2d 820, 823 (5th Cir. 1980). HTC cannot make that showing. The additional instructions HTC demands on appeal were superfluous. Ericsson's evidence that its offers to HTC were FRAND—including the royalties paid by similar licensees—was overwhelming. HTC's position that it was entitled to pay a tiny fraction of what other licensees (or it previously) paid

was absurd.  *See* pp. 14-15, *supra*.  And the district court independently ruled that, "even in the absence of" the jury's verdict, it would have found Ericsson's offers complied with FRAND.  ROA.35064.  Refusing superfluous instructions here was not error, and certainly not prejudicial error warranting a new trial.[7]

### D.    HTC's Proposed Instructions Were Incorrect

"'A party cannot claim error in the refusal to give a requested instruction which is not entirely correct, or which it is not possible to give without qualification, or which is so framed as to be capable of being misunderstood.'" *Burns v. Travelers Ins. Co.*, 344 F.2d 70, 74 (5th Cir. 1965).  That was precisely the case here.

#### 1.    Apportionment Instructions

HTC's proposed instruction "K" stated that, where products "have both patented and unpatented features, a 'reasonable royalty' requires that the value of the patented features is apportioned from the non-patented features *using reliable and tangible evidence*."  ROA.32317 (emphasis added).  None of the model jury instructions cited by HTC contain anything like the "reliable and tangible evidence" requirement HTC demands.  There is no basis for directing the jury to

---

[7] HTC cites (at 47) a jury question regarding the verdict form as evidence of "actual confusion."  When the district court sought HTC's input on a response, however, HTC suggested that the verdict form be revised to ask separately about 2016 versus 2018 negotiations.  ROA.11052-54.  HTC said nothing about a clarifying instruction on valuation or non-discrimination.

use a different evidentiary standard or to limit the jury to "tangible" evidence on this issue. Assessment of reliability is a task for the district court. *See VirnetX*, 767 F.3d at 1328. The terms "reliable" and "tangible" would have simply caused confusion.

HTC's instruction K was also misleading, as was proposed instruction L. Instruction K told the jury that a "'reasonable royalty' requires that *the value of the patented features* is apportioned *from the non-patented features*." ROA.32317 (emphasis added). Similarly, instruction L directed that "patented *invention(s)* must be *apportioned from all of the other technology* reflected in the standard that is not patented by the SEP holder." ROA.32317 (emphasis added). Both statements are misleading. Not even U.S. patent-damages law requires that the "*invention*" be apportioned "from all of the *other technology*" in a product. What matters is the "incremental *value* that the patented invention adds to the end product," *D-Link*, 773 F.3d at 1226 (emphasis added), as the models cited by HTC instruct.[8]

In making that determination, the jury does not isolate the value of the invention "from the non-patented *features*." Nor does it segregate the "invention"

---

[8] AIPLA model instruction 10.2.5.1 explains that a "reasonable royalty award must be based on *the incremental value that the patented invention adds to the end product*." Even "when the infringing" products "have both patented and un-patented features," the model instruction emphasizes, the jury should determine "*the value added by* the patented features." *Id.* (emphasis added).

from "other technology." Quite the opposite: The jury looks to the value the patented technology adds to the "end product," which may include enhancing the value of *other* technologies the product uses. *See Rembrandt Wireless Techs., LP v. Samsung Elecs. Co.*, 853 F.3d 1370, 1380-81 (Fed. Cir. 2017).

An example illustrates why HTC's proposed instructions were wrong. A high-resolution phone screen may be of lesser value if it cannot be fed high-definition video due to a low-speed cellular connection. Patented technology that increases data throughput, letting the user enjoy the full resolution of the screen, adds to the value of that screen and the phone as a whole. Even patent-damages law allows that to be taken into account in setting royalties. *See Rembrandt*, 853 F.3d at 1380-81; U.S. Br. 14. That is why the model jury instructions and *D-Link* direct the jury to the value the patented invention adds "to the end product"—not to isolate the patented technology and to ignore its effect on other features or the product as a whole. 773 F.3d at 1226. HTC's proposed instructions K and L incorrectly suggest the opposite.

HTC's proposals also misleadingly suggest that "apportionment" requires a separate analysis, supported with "reliable and tangible evidence." ROA.32317. The Federal Circuit has rejected that notion. It has held that comparable licenses, like Ericsson presented, have apportionment "built in" by virtue of market forces, because "the parties negotiated over the value of the asserted patent[s], 'and no

more.'" *CSIRO*, 809 F.3d at 1303; *see* pp. 40-41, *supra*.  The government agrees.

U.S. Br. 18-19.  At trial, HTC pressed the incorrect view that Ericsson had to

present an "apportionment analysis" apart from comparable licenses.  *See, e.g.*,

ROA.10356 ("Q:  So you did a comparable license analysis, but no apportionment

analysis?").  HTC's proposed instruction threatened to foster that same erroneous

understanding.

### 2.    *Non-Discrimination Instructions*

Even a glance at HTC's proposed non-discrimination instruction reveals its

shortcomings:  It attempts to argue HTC's position—and its experts' views—

through the district court.  HTC proposed:

> The non-discrimination requirement of FRAND requires an SEP holder to provide similar licensing terms to licensees that are similarly situated.  The financial terms do not have to be precisely identical, because the difference might be explained by other offsetting adjustments in other terms in the license.  But, ***at a minimum, if the difference in terms creates a competitive disadvantage for a prospective licensee, then the offered royalty terms are discriminatory*** . . . .

> The non-discrimination prong of FRAND serves to level ***the playing field among competitors***, and ***to foster entry and innovation*** from new market participants, by prohibiting preferential treatment that imposes different costs to different competitors.  Thus, for purposes of the non-discrimination prong of FRAND, ***licensees are "similarly situated" if they compete for the purchase or sale of a product or service***.  ***It would defeat the purpose of FRAND*** if a licensor could draw a distinction between entrenched and emerging firms or between large or powerful and small or weak firms in the same markets, ***since it would impose artificially increased costs on competition from some firms and inhibit their ability to fairly compete***.

HTC Br. 40-41 (emphasis added).

Unable to point to anything in ETSI's drafting history to support that argumentative instruction, HTC cited its hired experts (Lynde, Morton, and Simcoe), who argued that FRAND should be construed according to their views of competition theory.  ROA.32321-23.  Ericsson disagreed with every point.  For example, HTC argued that, in looking to comparable licenses, *all* companies in the phone industry are "similarly situated" (regardless of differences in geography, volume, or technology).  *See* ROA.10397 ("every company in an industry [must] basically get the same deal").  HTC's definition would turn FRAND into a most-favored-licensee clause:  Under it, all companies would be entitled to similar rates as the company with the lowest rates.

In contrast, Ericsson showed that, as a matter of intent and industry custom, FRAND is not a most-favored-licensee clause; that it does not require identical treatment of all parties; and that licenses can accommodate the "circumstances of [each] respective case."  ROA.10606; *see* pp. 13-14, *supra*.  The district court would have erred by treating these disputed issues as established facts by giving HTC's proposed instruction.  *United States v. Lewis*, 671 F.2d 1025, 1027-28 (7th Cir. 1982) (affirming denial of a jury instruction because it "assumed a fact" that was hotly disputed).

Moreover, as the Government explains, imposing HTC's detailed definitions onto FRAND would undermine ETSI's purpose in leaving the term flexible and

47

applicable to numerous contexts. *See* U.S. Br. 22-26. In deciding the scope and meaning of the contractual non-discrimination requirement, the jury was capable of making "factual determination[s]" based on "extrinsic evidence."

## II. Substantial Evidence Supports the Jury's Finding That Ericsson's Offers Were FRAND

HTC contends that the district court erred in declaring—consistent with the jury's verdict—that Ericsson's offers were FRAND. HTC Br. 50.[9] HTC does not dispute that the district court was empowered to enter a declaratory judgment. Instead, it challenges the sufficiency of the evidence supporting that result. But HTC waived any such challenge. Its arguments are also meritless.

### A. HTC's Challenge to the Verdict Is Waived

HTC couches its appeal as directed to the declaratory judgment ruling, which held that Ericsson's offers to HTC complied with FRAND. ROA.35068-72. HTC does not dispute that the district court had legal authority to enter a declaratory judgment finding Ericsson's offers to be FRAND based on the jury's verdict (with which the district court independently agreed). ROA.35064, 35072. Instead, HTC urges that, "as a matter of law," the record cannot support a finding that Ericsson's offers were non-discriminatory. HTC Br. 50. That is nothing more than a sufficiency-of-the-evidence challenge to the jury verdict itself.

---

[9] If the Court remands for a new trial, the declaratory judgment should be vacated and remanded as well. HTC Br. 47-49.

A Rule 50 motion is essential to preserving any challenge to the sufficiency of the evidence. *See Coughlin v. Capitol Cement Co.*, 571 F.2d 290, 297 (5th Cir. 1978). But HTC never filed a Rule 50(b) motion. "Absent [a Rule 50(b)] motion, . . . an appellate court is 'powerless' to review the sufficiency of the evidence after trial." *Ortiz v. Jordan*, 562 U.S. 180, 189 (2011). The district court was not required to disregard a jury verdict that HTC never challenged as unsupported under Rule 50(b).[10]

## B.    Ample Evidence Supported the Verdict

Ample evidence supports the verdict regardless. The "standard of review with respect to a jury verdict is especially deferential." *Brown v. Bryan Cty.,* 219 F.3d 450, 456 (5th Cir. 2000). A verdict should not be overturned unless the trial record points "so strongly and overwhelmingly in the movant's favor that reasonable jurors could not reach a contrary conclusion." *Omnitech Int'l, Inc. v. Clorox Co.*, 11 F.3d 1316, 1323 (5th Cir. 1994).

### 1.    *Ample Evidence Supports the Finding That Ericsson's Offers Did Not Discriminate*

Both parties agreed that the jury could consider the royalties paid by similarly situated licensees. The record contains ample evidence to support the jury's

---

[10] HTC is not entitled to plain-error review. *OneBeacon Ins. Co. v. T. Wade Welch*, 841 F.3d 669, 680 (5th Cir. 2016) (citing *McLendon v. Big Lots Stores*, 749 F.3d 373, 374-75 n.2 (5th Cir. 2014) (applying prior panel precedent rule)).

finding that Ericsson did not discriminate against HTC, even under HTC's definition.

As explained above, when Ericsson negotiates a license, it assesses the prospective license based on various factors, such as the availability of a cross-license and sales volume.



ROA.10891-900. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮  ROA.11618-20. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮  ROA.39929-31; ROA.11609; ROA.11621.  The jury was entitled to credit the testimony of Ericsson's expert both as to which companies

were similarly situated to HTC, and as to what constituted similar treatment. *See VirnetX*, 767 F.3d at 1331 (deciding which licenses are comparable is for jury).

HTC argues that Ericsson discriminated because some companies paid lower dollars-per-unit royalties. But those other companies were not similarly situated to HTC. ██████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

ROA.11592-94.



ROA.11612-22.

HTC also points to licenses with Samsung, Huawei, and Apple. But Ericsson showed they were not similarly situated to HTC.

*First*, 

ROA.39929.

ROA.39930.

*Second,* all the companies identified by HTC sold orders of magnitude more devices than HTC.



Handset Sales 2017 (Millions of Units)

ROA.11609.  A reasonable jury could have found that HTC, selling under 10 million devices, was not similarly situated to Samsung, Apple, Huawei, or LG.

ROA.11608-609; ROA.10127.    Ericsson, moreover, presented evidence that volume discounts are standard practice in the industry.  ROA.11627-29.

*Third,* Samsung, ZTE, Huawei, and LG are major patent holders. ROA.11573.    Under those licenses, Ericsson received a valuable cross-license to patents needed for its multi-billion-dollar global base station business. ROA.11572-73.  HTC, in contrast, has no patents that Ericsson needs to license. ROA.11573.

*Fourth,* Ericsson showed that Huawei and ZTE sell mostly in China and emerging markets, where patents can be less valuable.  ROA.11574.

*Fifth,* Ericsson entered into . ROA.11574-75. . ROA.11575; ROA.10898, 10955; *see* ROA.11559-75 (Petersson testimony).

The jury heard evidence that . ROA.11613-620; pp. 50-51, *supra*. . ROA.11620-622.

*Finally*, while HTC's experts testified that proving discrimination requires showing that any price differences created a competitive "disadvantage," HTC made no such showing. ROA.10453; *see also* ROA.17912. HTC's Vice President of Product Planning testified that "none of" HTC's business woes "ha[d] anything to do with Ericsson." ROA.11276. Ericsson's economic expert testified that HTC would not suffer a competitive disadvantage by paying the offered royalty. ROA.10740. The jury was entitled to credit that testimony.

## 2.    *Ericsson's Offers Were Fair and Reasonable*

HTC cursorily argues (at 53) that Ericsson's offers were not "fair and reasonable." Ericsson's evidence supported the jury's finding that Ericsson's offers were fair and reasonable in light of what other Ericsson licensees had paid. *See* p. 51, *supra*. ███████████████████████████████ ██████. *See* pp. 50-51, *supra*. Both HTC and Ericsson estimated HTC's lump-sum payment under the 2014 license at about ████ per 4G device. ROA.11604-06. The jury was entitled to credit that evidence as proof that Ericsson's offers (1% of sales price or $2.50 per phone) were fair and reasonable— and to reject HTC's position that the fair and reasonable rate meant $0.01-0.08, a tiny fraction of what others paid.

3.    *The Jury Was Entitled To Reject HTC's Proposed Definition of Non-Discrimination*

Confronted by ample evidence supporting the jury's verdict, HTC attempted to change the standard.  HTC urges (at 53) that "non-discrimination" means that "every company in an industry basically get[s] the same deal."  *See* ROA.10397.

HTC's rule, however, finds no support in the contract's text.  As explained above, ETSI deliberately left FRAND undefined.  *See* pp. 13-14, *supra*.  The extrinsic evidence belies HTC's view.  Ericsson's Dr. Huber—who helped draft the FRAND commitment—testified that FRAND was intended to have flexible meaning with the goal of ensuring access to the standard and balancing the interests of patent holders and implementers.  ROA.10577, 10585-86.  He also testified that the non-discrimination provision protects non-European and non-ETSI members, ROA.10580-81, but it does not require all competitors to receive identical rates, ROA.10581-85.

HTC's proffered definition of "non-discrimination" turns FRAND into a "most-favored-licensee" clause where ***all*** companies must receive the lowest rate any company has paid.  But Dr. Huber testified that FRAND has no "most favored license" clause; ETSI expressly considered and rejected imposing such a requirement.  ROA.10582-85; pp. 3-5, *supra*.  HTC, by contrast, presented no evidence of ETSI's intent, or industry practice.  HTC offered only testimony from experts

55

without licensing or ETSI experience, addressing abstract economic theories. ROA.10392-430.[11]  The jury was entitled to credit Ericsson's expert and evidence.

## III.  The District Court Properly Excluded Expert Opinions From Other Trials

Below, HTC sought the admission of thousands of pages of expert reports from independent experts who had testified for Ericsson in other litigation. ROA.9598-99.   The district court properly excluded those hearsay documents. Singling out one report, HTC urges that it was admissible as the admission of a party-opponent.  HTC Br. 55-56.  The district court, like many courts before it, properly rejected the contention that the opinions of independent testifying experts are party admissions.  Regardless, HTC shows no prejudice.

### A.    The Opinions Were Inadmissible Hearsay

HTC argues (at 53-55) that the Kennedy expert reports are non-hearsay, because they qualify as admissions of a party-opponent under Federal Rule of Evidence 801(d)(2)(C).   HTC urges that Mr. Kennedy was Ericsson's agent, because Ericsson "hir[ed] and sponsor[ed]" him as a testifying expert.  HTC Br. 55.

Court after court has rejected that argument, holding that expert testimony and reports in prior cases are not admissible as party admissions.  *See, e.g., Kirk v.*

---

[11] HTC cites U.S. law defining "non-discrimination" under U.S. antitrust statutes without any explanation why the ETSI FRAND commitment, crafted in 1994 and governed by French law, would adopt it.  HTC Br. 50 n.5.

*Raymark Indus., Inc.*, 61 F.3d 147, 163-64 (3d Cir. 1995); *Fractus, S.A. v. AT&T Mobility LLC*, 2:18-cv-00135, 2019 U.S. Dist. LEXIS 169610, at *13 (E.D. Tex. Sep. 30, 2019) (following *Kirk*). HTC ignores those cases—and their reasoning. In *Kirk*, the Third Circuit held that independent testifying experts are not agents because they are "not subject to the control of the [retaining] party . . . with respect to consultation and testimony [they are] hired to give." 61 F.3d at 164. The court reasoned that independent experts offer testimony based on their ***own*** credibility and ***independent*** judgment—they are not mere mouthpieces. *See* Fed. R. Civ. P. 26(a)(2)(B) (requiring affirmation that expert's opinions are their own); 30B Wright & Miller, *Federal Practice and Procedure* § 6775 (2018 ed. & Supp. 2019) ("In the case of witness testimony, it is anomalous to argue that even paid experts are speaking on behalf of a party."); *but cf. In re Hanford Nuclear Reservation Litig.*, 534 F.3d 986, 1016 (9th Cir. 2008) (not an abuse of discretion to allow a party to cross-examine testifying expert during retrial using the same expert's testimony from the first trial).

HTC invokes a single case—*Collins v. Wayne Corp.*, 621 F.2d 777 (5th Cir. 1980)—for its view that the opinions of testifying witnesses are party admissions. HTC Br. 55. That case, however, involved a genuine party agent, not an ordinary testifying expert. There, the defendant company had hired an accident investigator to survey the facts after a boat collision. Relying on other cases where such

*accident investigators* were deemed agents, *Collins*, 621 F.2d at 781-82, this Court held that the investigator's report was a party admission because the defendant had hired the investigator to "investigate and analyze" the accident and "report his conclusions," *id.* at 782. *Collins* nowhere held that independent testifying experts are always agents. To the contrary, this Court has never applied *Collins* to an independent expert witness. *See, e.g., Theriot v. J. Ray McDermott & Co.*, 742 F.2d 877, 882 (5th Cir. 1984).

HTC makes no comparable showing. Whatever "circumstances" may sometimes justify treating an expert's statement as a party admission, they are "narrowly construed." *Fox v. Taylor Diving & Salvage Co.*, 694 F.2d 1349, 1355 (5th Cir. 1983). HTC urges the opposite—that *Collins* creates a blanket rule that testifying experts are always party agents. That reading of *Collins* has been firmly rejected. As *Kirk* explained, merely being designated a testifying expert does not render a witness a party agent. 61 F.3d at 163-64. *Collins*, it held, cannot be read as taking a contrary view. *Id.* The result in *Collins* rested on an "explicit finding on the record" that the expert "was an agent." *Id.* at 164 n.20. He had been retained as an accident investigator for the company, not merely as a testifying expert. *Id.* at 163-64.

The district court ruled that, consistent with *Fox* and *Kirk*, there must be an "additional affirmative showing of some cloaking in a relationship that would rise

to the level of agency." ROA.9610. It found that HTC failed to make that "additional affirmative showing" here. ROA.9610. HTC urges (at 56), that "Kennedy was retained by Ericsson," "Ericsson asked him to opine on various issues," and he "was performing the function Ericsson had employed him to perform." But that describes every independent testifying expert. *See* p. 57, *supra*. Kennedy made clear that he was testifying as an independent expert, and that his compensation did not depend on the opinions he expressed. ROA.1967. The district court did not abuse its discretion, particularly given the "narrow" and fact-specific nature of the inquiry. *Fox*, 694 F.2d at 1355.

## B.    The District Court's Ruling Is Not Reversible Error

While the court ruled that Mr. Kennedy's opinions were not admissible as party admissions, it did not preclude their use altogether. The court expressly permitted the use of Kennedy's prior testimony and reports for impeachment purposes. ROA.9609-11. It simply declined a wholesale ruling that myriad expert reports, spanning thousands of pages, were admissible in their entirety. That was not reversible error, for two reasons.

*First*, HTC can show no prejudice, because the reports were inadmissible regardless. *See Metallurgical Indus. Inc. v. Fourtek, Inc.*, 790 F.2d 1195, 1207 (5th Cir. 1986). Courts may exclude evidence where its "probative value [is] substantially outweighed by a danger of . . . unfair prejudice." Fed. R. Evid. 403.

59

Evidence of prior litigation poses a particularly high risk of unfair prejudice. *E.g.*, *Texas Pig Stands, Inc. v. Hard Rock Cafe Int'l, Inc.*, 951 F.2d 684, 690 (5th Cir. 1992).

That was especially true here. HTC sought to submit expert reports and witness statements from two prior cases from "third-party experts not retained in this case." ROA.30026. They were "hundreds of pages long" with "detailed and complicated arguments on a wide range of technical issues." ROA.30026; *see, e.g.*, ROA.1943-2121. The reports were filled with irrelevant and improperly prejudicial materials, such as legal statements on "FRAND, general economic theories, license unpackings, and market observations from an earlier time period and based on different facts." ROA.30026.

The district court was properly sensitive to that risk. HTC had sought wholesale admission of factual and legal findings from prior arbitrations and suits, even though those cases involved different plaintiffs, different facts, different time periods, and a changed patent portfolio. The district court excluded such evidence because the risk of undue prejudice substantially outweighed any probative value. ROA.9610. The district court did not err in preventing HTC from circumventing that ruling by introducing expert reports from those very same cases.

*Second*, the district court specifically ruled, among other things, that the reports and testimony could be used for impeachment purposes. ROA.9606-10.

"To the extent there's *any witness* in this case who testifies inconsistently with what that expert has testified to or taken a position on earlier," it held, "they're subject to being impeached."  ROA.9609 (emphasis added).  HTC's sole claim to prejudice is its supposed inability to use Kennedy's reports for "impeachment." HTC Br. 57.  That cannot be reconciled with the district court's express ruling that impeachment would be permitted.

Despite the court's ruling that HTC could use the expert's statements for impeachment, HTC never attempted to examine Ericsson's corporate representative or experts on any inconsistencies about Kennedy's calculations or on the calculations performed by any prior Ericsson expert.  HTC cannot claim prejudice, and obtain a new trial, based on its own refusal to exploit the opportunity for cross-examination the court provided.

## CONCLUSION

The judgment should be affirmed.

December 6, 2019                    Respectfully submitted,

/s/ Theodore Stevenson, III         Jeffrey A. Lamken

Theodore Stevenson, III             Rayiner I. Hashem
   *Counsel of Record*          Benjamin T. Sirolly
Nicholas Mathews                    MOLOLAMKEN LLP
Chelsea Priest                      The Watergate, Suite 660
MCKOOL SMITH, P.C.                  600 New Hampshire Avenue, N.W.
300 Crescent Court, Suite 1500      Washington, D.C.  20037
Dallas, TX  75201                   (202) 556-2000
(214) 978-4000

Charles E. Fowler, Jr.
MCKOOL SMITH, P.C.
300 W. 6th Street, Suite 1700
Austin, TX  78701
(512) 692-8700

Samuel Franklin Baxter
MCKOOL SMITH, P.C.
104 E. Houston Street, Suite 300
Marshall, TX  75670
(903) 923-9000

Blake H. Bailey
MCKOOL SMITH, P.C.
600 Travis Street, Suite 7000
Houston, TX  77002
(713) 485-7300

*Counsel for Defendants-Appellees*
*Telefonaktiebolaget LM Ericsson and Ericsson, Incorporated*

# CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was served on

this 9th day of December, 2019 by e-mail on the following counsel:

David J. Burman
T. Andrew Culbert
Kevin A. Zeck
PERKINS COIE LLP
1201 Third Avenue, Suite 4900
Seattle, WA  98101
DBurman@perkinscoie.com
ACulbert@perkinscoie.com
KZeck@perkinscoie.com

Andrew T. Dufresne
PERKINS COIE LLP
33 E. Main Street, Suite 201
Madison, WI  53703
ADufresne@perkinscoie.com

Jennifer Haltom Doan
HALTOM & DOAN
6500 N. Summerhill Road, Suite 100
Texarkana, TX  75503
jdoan@haltomdoan.com

Dated: December 9, 2019


                                   */s/ Theodore Stevenson, III*
                                   Theodore Stevenson, III

# CERTIFICATE OF COMPLIANCE

I certify the following:

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B).  This brief contains 12,998 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).  Microsoft Word was used to calculate the word count.

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6).  This brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman type style.

Dated:  December 6, 2019

*/s/ Theodore Stevenson, III*
Theodore Stevenson, III