# United States Court of Appeals

*for the*

# Fifth Circuit

Case No. 19-40566

CONSOLIDATED WITH: 19-40643 HTC CORPORATION;
HTC AMERICA, INCORPORATED,

*Plaintiffs-Appellants,*

v.

TELEFONAKTIEBOLAGET LM ERICSSON; ERICSSON, INCORPORATED,

*Defendants-Appellees.*

Case No. 19-40643

HTC CORPORATION; HTC AMERICA, INCORPORATED,

*Plaintiffs-Appellants,*

v.

TELEFONAKTIEBOLAGET LM ERICSSON; ERICSSON, INCORPORATED,

*Defendants-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS, TYLER

## BRIEF OF *AMICUS CURIAE* NOKIA TECHNOLOGIES OY IN SUPPORT OF DEFENDANTS-APPELLEES TELEFONAKTIEBOLAGET LM ERICSSON, ERICSSON, INCORPORATED AND AFFIRMANCE

ANDREW J. TUCK
ALSTON & BIRD LLP
*Attorneys for Amicus Curiae*
  *Nokia Technologies Oy*
1201 West Peachtree Street, Suite 4900
Atlanta, Georgia 30309
(404) 881-7000

## STATEMENT OF CONSENT TO FILE AND TIMELINESS

Pursuant to Federal Rule of Appellate Procedure 29(a)(2), Nokia Technologies Oy files this *amicus curiae* brief with the consent of all parties.

Pursuant to Local Rule 29.1, this brief has been filed in a timely manner within seven days of the date Defendants-Appellees' principal brief was filed on December 6, 2019.

**SUPPLEMENTAL STATEMENT OF INTERESTED PARTIES**

Pursuant to Local Rule 29.2, the undersigned counsel of record for *amicus curiae* Nokia Technologies Oy certifies that the following additional persons and entities have an interest in the outcome of this case:

1. Nokia Technologies Oy, *amicus curiae*. Nokia Technologies Oy is wholly-owned by Nokia Corporation, a publicly held corporation. No other publicly held corporation owns 10 percent or more of the stock of Nokia Technologies Oy.

2. Andrew J. Tuck, counsel of record for *amicus curiae* Nokia Technologies Oy.

Dated: December 13, 2019          */s/ Andrew J. Tuck*
                                 Andrew J. Tuck

## STATEMENT OF AUTHORSHIP AND FUNDING

Pursuant to Federal Rule of Appellate Procedure 29(a)(4), counsel for *amicus curiae* states that no party's counsel authored this brief in whole or in part; no party's counsel contributed money that was intended to fund preparing or submitting this brief; and no person other than *amicus curiae* or their counsel contributed money that was intended to fund preparing or submitting this brief.

# **TABLE OF CONTENTS**

STATEMENT OF CONSENT TO FILE AND TIMELINESS ................................. i

SUPPLEMENTAL STATEMENT OF INTERESTED PARTIES ......................... ii

STATEMENT OF AUTHORSHIP AND FUNDING ............................................ iii

TABLE OF CONTENTS ........................................................................................ iv

TABLE OF AUTHORITIES ................................................................................. vi

INTEREST AND IDENTITY OF *AMICUS CURIAE* ............................................ 1

SUMMARY OF ARGUMENT ............................................................................... 3

ARGUMENT .......................................................................................................... 5

I.      FRAND Is a Global and Flexible Concept That Does Not Mandate a
        Particular Approach ................................................................................... 5

        A.      The Global Nature of SEP Portfolios Needs To Be Taken Into
                Account When Evaluating FRAND Compliance. ............................. 5

                1.      Moreover, the Federal Circuit has held that the SSPPU
                        principle is not a mandatory method for U.S. patent valuation .. 6

                2.      Foreign court decisions and longstanding industry practice
                        confirm that the SSPPU rule, as interpreted by HTC, is
                        inapplicable to SEP portfolio FRAND licenses ......................... 8

        B.      The District Court's FRAND Instruction to the Jury was Proper
                and Did Not Constitute an Abuse of Discretion. ............................ 10

II.     Comparable Licenses Are Often the Best Way to Value SEP
        Portfolios and Determine Whether an Offer Is FRAND .............................. 14

        A.      Valuation of SEP Portfolios Must Strike the Appropriate
                Balance Between Access to Technology and Incentive to
                Innovate .......................................................................................... 14

        B.      Using Comparable Licenses to Determine Whether an Offer is
                FRAND Typically Values SEP Portfolios Properly and
                Promotes Innovation ....................................................................... 16

CONCLUSION ...................................................................................................20

CERTIFICATE OF SERVICE ...............................................................................21

CERTIFICATE OF COMPLIANCE.......................................................................22

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Apple Inc. v. Motorola, Inc.*,
   757 F.3d 1286 (Fed. Cir. 2014), *overruled on other grounds by*
   *Williamson v. Citrix Online, LLC,* 792 F.3d 1339 (Fed. Cir. 2015)...................16

*Commonwealth Sci. & Indus. Research Org. v. Cisco Sys., Inc.*,
   809 F.3d 1295 (Fed. Cir. 2015) ...............................................................6, 7, 18

*Elbit Sys. Land & C4I Ltd. v. Hughes Network Sys., LLC*,
   927 F.3d 1292 (Fed. Cir. 2019) ........................................................................18

*Ericsson, Inc. v. D-Link Sys., Inc.*,
   773 F.3d 1201 (Fed. Cir. 2014) .......................................................................6, 7

*Exmark Mfg. Co. v. Briggs & Stratton Power Prods. Grp., LLC*,
   879 F.3d 1332 (Fed. Cir. 2018) ..........................................................................7

*Huawei Techs. Co. Ltd v. Samsung (China) Inv. Co., Ltd. et al.*,
   Y03 MC No. 840 (2016)...................................................................................5, 8

*LaserDynamics, Inc. v. Quanta Comput., Inc.*,
   694 F.3d 51 (Fed. Cir. 2012) .............................................................................16

*Lucent Techs., Inc. v. Gateway, Inc.*,
   580 F.3d 1301 (Fed. Cir. 2009) ...........................................................................7

*Monsanto Co. v. McFarling*,
   488 F.3d 973 (Fed. Cir. 2007) ...........................................................................16

*Nickson Indus., Inc. v. Rol Mfg. Co.*,
   847 F.2d 795 (Fed. Cir. 1988) ...........................................................................16

*Summit 6, LLC v. Samsung Elecs. Co.*,
   802 F.3d 1283 (Fed. Cir. 2015) .........................................................................16

*TCL Communication Technology Holdings, Ltd. v.*
   *Telefonaktiebolaget LM Ericsson*
   CV15-2370, 2018 WL 4488286 (C.D. Cal. Sept. 14, 2018) ........................18, 19

*Unwired Planet Int'l Ltd. v. Huawei Techs. Co.*,
[2017] EWHC 2988 (Pat) (Nov. 30, 2017)................................................5, 7, 16

**OTHER AUTHORITIES**

ETSI, *Guide on Intellectual Property Rights* (2013)................................................10

Jorge Contreras, *Origins of FRAND Licensing Commitments in the
United States and Europe* in THE CAMBRIDGE HANDBOOK OF
TECHNICAL STANDARDIZATION LAW 168 (Jorge Contreras ed.,
2018) ........................................................................................................................13

## INTEREST AND IDENTITY OF *AMICUS CURIAE*

*Amicus curiae* is Nokia Technologies Oy. Nokia[1] is a leading innovator in the telecommunications industry. Nokia has cumulatively invested approximately $140 billion in research and development predominantly relating to mobile communications over the past two decades, and as a result of this commitment, currently owns around 20,000 patent families. Nokia has also played a prominent role in developing technologies that are incorporated in the 2G, 3G, 4G, and 5G mobile cellular standards that have been vital to the success of the global mobile telecom market. Nokia is a significant owner of cellular standards-essential patents ("SEPs") and has a significant number of licensees to those cellular SEPs. Nokia remains at the forefront of developing cellular technologies, including in emerging 5G standards, and continues to contribute its inventions to relevant standard developing organizations as well as to renew and expand its industry-leading patent portfolio.

Nokia also has been and remains one of the largest manufacturers of wireless, fixed, and optical telecommunications network equipment. Nokia's heavy investments in related research and development continue, including around $5.3 billion invested in 2018 alone. As part of its ongoing businesses, which employ

---

[1] References to Nokia in this section include Nokia Technologies Oy and its parent, Nokia Oyj, and its affiliates.

approximately 100,000 people and operate in roughly 130 countries, Nokia has also

negotiated and secured licenses to cellular SEPs owned by other industry players.

Nokia's experience is extensive as both an SEP licensor and licensee.

Nokia further has been involved in numerous patent cases in U.S. district

courts, both as a plaintiff and a defendant, including cases involving SEPs. Nokia

believes that its perspective will assist the Court in evaluating certain of the issues

presented in this appeal. As both an owner of a substantial portfolio of SEPs and a

manufacturer of standards-compliant products, Nokia has a strong interest in

ensuring the appropriate statement and application of equitable and legal standards

when addressing fair, reasonable, and non-discriminatory ("FRAND") license terms

for portfolios of SEPs.

Innovation contributed to open standards in the form of SEPs has fueled a

very successful industry and enabled a common communication platform on which

incremental innovation is taking place. Absent a framework that assures proper

compensation to innovators for their substantial research and development efforts

and investments, companies such as Nokia will lack incentive to continue to

innovate in this space and to contribute their innovation to open standards, which

will inhibit technological progress. Nokia seeks to ensure that innovation contributed

to open standards will continue to be valued properly so as to benefit both

implementers and innovators.

Although Nokia does not take any position on the facts of the specific licensing dispute between Ericsson and HTC, in Nokia's experience in dealing with global SEP portfolio licensing offers and related disputes, FRAND is a global concept that was intended to be flexible and to allow for consideration of the totality of particular facts and circumstances. Comparable licenses generally provide powerful market evidence about the value that licensors and licensees place on a given portfolio of SEPs, as well as the reasonableness of various terms in such licenses, and, as a result, such licenses are typically a leading indicator of what the market considers to satisfy FRAND for a given portfolio of SEP patents.

## SUMMARY OF ARGUMENT

In addressing the value of a global portfolio of SEPs, it is important to recognize that FRAND is a global concept that depends upon the totality of the particular facts and circumstances of a negotiation and that there is no fixed or mandated methodology for setting or calculating the terms of a FRAND license. FRAND therefore requires flexibility, particularly when addressing the appropriate valuation of global SEP portfolios. This is precisely why numerous standard setting organizations ("SSOs"), including ETSI, have intentionally chosen not to define FRAND, leaving room for parties to take various factors into account during negotiations.

The district court's FRAND jury instructions in this case properly accounted for these considerations by providing flexibility for the jury's deliberations. HTC's proposed jury instructions did not. HTC proposed a rigid definition of FRAND, which would, if accepted, require worldwide adoption of the smallest saleable patent practicing unit ("SSPPU") concept — a U.S. evidentiary principle limited in application for use in only some U.S. patent infringement cases and only with respect to damages issues for certain types of individual patent claims. HTC also proposed a definition of "non-discrimination" that would equate to a most-favored licensee clause among all SEP licensees, a concept which ETSI affirmatively abandoned decades ago. Such rigid positions are not mandated by the terms of the ETSI FRAND undertaking itself, are unduly restrictive and untenable, and, if adopted would disrupt decades of industry practice. As a result, there was no error in this case based on the FRAND instructions that the district court gave the jury, or in that court failing to instruct the jury on HTC's incorrect view of non-discrimination.

In valuing global SEP portfolios, it is important to strike the proper balance between making SEPs available to implementers and ensuring that innovators are adequately rewarded for their contributions to the underlying standards. In doing this, courts can and should use real-world market data—including comparable licenses—whenever possible, as well as reliable methods to properly value a portfolio of SEPs. When available, market-based evidence typically provides the

best data regarding the value of the patented technology embodied in a given SEP portfolio, and should be given preference over other artificial constructs such as HTC's proposed apportionment analysis.

## ARGUMENT

### I.    FRAND IS A GLOBAL AND FLEXIBLE CONCEPT THAT DOES NOT MANDATE A PARTICULAR APPROACH.

#### A.    The Global Nature of SEP Portfolios Needs to be Taken Into Account When Evaluating FRAND Compliance.

Because ETSI standards have been implemented globally for interoperable products, FRAND licenses under the ETSI IPR policy are generally global in nature and the royalty rates for global portfolio SEP licenses often represent a single rate per standard payable on sales all over the world. Yet in this case, HTC insists that in a dispute over a global portfolio FRAND license, the FRAND undertaking requires the SEP owner to begin with the baseband processor as the royalty base because, according to HTC, it is the alleged SSPPU. But SSPPU is an evidentiary concept used by U.S. courts in some patent infringement cases and only in connection with U.S. patent damages issues for certain types of patent claims in order to avoid jury confusion. To the best of Nokia's knowledge, the SSPPU concept has not been recognized anywhere else in the world. *See Unwired Planet Int'l Ltd. v. Huawei Techs. Co.*, [2017] EWHC 2988 (Pat) (Nov. 30, 2017) (not applying U.S. concept of SSPPU in analyzing similar issues); *Huawei Techs. Co. Ltd v. Samsung (China) Inv. Co., Ltd. et al.*, Y03 MC No. 840 (2016) (same). HTC's insistence that in this case

FRAND rates for a global portfolio license must be based on an improper application of a U.S. patent damages evidentiary rule has no basis in U.S. law or any law of another country. The net effect of HTC's suggested approach would destroy comity as it could require application of the SSPPU concept to foreign patents and foreign jurisdictions, thereby making U.S. evidentiary rules—intended to apply in only select U.S. patent infringement cases to avoid jury confusion—potentially applicable in foreign actions not even involving juries. And such an application would potentially result in superseding or nullifying the applicable patent laws of local jurisdictions around the globe.

> ### 1. Moreover, the Federal Circuit has held that the SSPPU principle is not a mandatory method for U.S. patent valuation.

The Federal Circuit has made clear that the SSPPU principle is simply meant to serve as guidance on the admissibility of evidence put before a U.S. jury about damages for infringement of certain types of individual U.S. patent claims. *See Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1226 (Fed. Cir. 2014) ("*D-Link Sys., Inc.*"); *Commonwealth Sci. & Indus. Research Org. v. Cisco Sys., Inc.,* 809 F.3d 1295, 1303 (Fed. Cir. 2015) ("*CSIRO*"). It is not a mandatory cornerstone for all economic methodologies used in valuing U.S. patents. As a result, the SSPPU doctrine is not mandated or used in all U.S. patent cases. Furthermore, the SSPPU doctrine is certainly not a required approach when valuing a *portfolio* of U.S. patents.

And, even more certainly, the SSPPU approach does not govern when the valuation at issue concerns a portfolio of patents including *foreign* patents from many different countries. The SSPPU concept was judicially created "to help [the U.S.] jury system reliably implement the substantive [U.S.] statutory requirement of apportionment," which merely holds that when choosing a royalty base in a U.S. patent infringement case, "care must be taken to avoid misleading the jury by placing undue emphasis on the value of the entire product." *D-Link Sys., Inc.*, 773 F.3d at 1226.

Recent Federal Circuit decisions have expressly rejected a rule, even in U.S. patent infringement cases involving individual patents, requiring "all damages models to begin with the [SSPPU]." *CSIRO*, 809 F.3d at 1303; *see also Exmark Mfg. Co. v. Briggs & Stratton Power Prods. Grp., LLC*, 879 F.3d 1332, 1348-49 (Fed. Cir. 2018) (explaining that "'[s]ophisticated parties routinely enter into license agreements that base the value of the patented inventions as a percentage of the commercial products' sales price,' and thus '[t]here is nothing inherently wrong with using the market value of the entire product.'") (quoting *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1325 (Fed. Cir. 2009) (brackets omitted)). This is consistent with *D-Link Sys., Inc.'s* holding that "otherwise comparable licenses are not inadmissible solely because they express the royalty rate as a percentage of total revenues, rather than in terms of the [SSPPU]." *CSIRO*, at 809 F.3d at 1303 (citing *D-Link Sys., Inc.*, 773 F.3d at 1228).

> **2.    Foreign court decisions and longstanding industry practice confirm that the SSPPU rule, as interpreted by HTC, is inapplicable to SEP Portfolio FRAND licenses.**

Foreign courts have not applied the U.S. concept of SSPPU when dealing with similar SEP portfolio valuation issues. For example, in *Unwired Planet Int'l Ltd. v. Huawei Techs. Co.,* the U.K. court considered as evidence all of Ericsson's comparable licenses, including those with royalties measured as a percent of the end-user product's net selling price. *See* [2017] EWHC 2988 (Pat) (Nov. 30, 2017). The U.K. court then determined benchmark FRAND rates, which were to be a percentage royalty based on the net selling price of the applicable end-user products (such as handsets). *See also Huawei Techs. Co. Ltd v. Samsung (China) Inv. Co., Ltd. et al.,* Y03 MC No. 840 (2016).

This approach is in line with the longstanding common industry practice under the ETSI IPR policy to license at the end-user product (e.g., handset) level. When licensing global portfolios of cellular SEPs using a running royalty approach, it is also a common practice to set royalties using either a dollar-per-unit rate or a percent of the net selling price of an end-user product. And this is, in fact, consistent with Nokia's experience both as a licensor and licensee in the telecommunications industry. *Ad valorem* royalty rates based on the price of end-user products are common and have been fully accepted by the industry in a substantial body of license agreements.

HTC now argues that this industry-wide understanding of what satisfies the FRAND undertaking can and should fundamentally change as a result of its misguided interpretation of select U.S. case law developments that occurred years after the ETSI IPR policy was adopted and SEP owners originally entered into their contractual FRAND commitments. HTC asks the Court to impose these fundamental changes and fully disregard the prevailing industry practice of licensing SEPs at the end-user device level, a practice that has been relied on as evidence by courts of other countries when addressing issues similar to those before this Court. HTC also argues that market data from numerous licenses that were agreed to by sophisticated parties should be completely disregarded as an improper "feedback loop." HTC Br. 9-10. In essence, HTC urges the Court to find that FRAND now should require something dramatically different than what is contained in those previously negotiated licenses. This is clear from HTC's wholesale and extraordinary dismissal of all comparable licenses.

In short, for global licenses, HTC wants to toss this data from all previously agreed comparable licenses aside in favor of an approach that is rooted in HTC's erroneous interpretation and application of a U.S. patent damages evidentiary concept. The plain language of the FRAND undertaking that SEP owners make to ETSI certainly imposes no such requirement and that should be the end of the analysis in a case that revolves around determining what FRAND requires of an SEP

owner as a matter of contract law. To hold otherwise would result in a fundamental shift in the meaning of FRAND being imposed on SEP owners long after the ETSI IPR policy was adopted and they entered into the vast majority of their FRAND commitments.

### B.    The District Court's FRAND Instruction to the Jury was Proper and Did Not Constitute an Abuse of Discretion.

The district court instructed the jury as follows with respect to Ericsson's FRAND obligation:

> Ericsson made a commitment to ETSI [with HTC as a third-party beneficiary] that [Ericsson] would license its patents essential to the 2G, 3G, and 4G/LTE standards on terms that are fair, reasonable, and non-discriminatory, otherwise known as FRAND terms.

> Whether or not a license is FRAND will depend upon the totality of the particular facts and circumstances existing during the negotiations and leading up to the license.

> Ladies and gentlemen, there is no fixed or required methodology for setting or calculating the terms of a FRAND license rate.

Dkt. 480 at 19.[2] The court's instruction that FRAND depends upon the totality of the particular facts and circumstances of a negotiation and that there is no fixed or required methodology for setting or calculating the terms of a FRAND license was wholly correct. As the U.S. Department of Justice pointed out in its *amicus* brief, it is undisputed that most SSOs, including ETSI, have not defined FRAND and instead

---

[2]    "Dkt." citations refer to the district court docket below.

have intentionally left room for parties to take various factors into account when seeking to conclude bilateral license agreements. And ETSI's *Guide on Intellectual Property Rights* expressly declines to consider the commercial elements of licensing agreements, instead leaving them to the parties most knowledgeable about those issues, which is the preferred outcome:

> Specific licensing terms and negotiations are commercial issues between the companies and shall not be addressed within ETSI. Technical Bodies are not the appropriate place to discuss IPR Issues. Technical Bodies do not have the competence to deal with commercial issues. Members attending ETSI Technical Bodies are often technical experts who do not have legal or business responsibilities with regard to licensing issues. Discussion on licensing issues among competitors in a standards making process can significantly complicate, delay or derail this process.

ETSI, *Guide on Intellectual Property Rights* § 4.1 (2013). Recognizing FRAND's intentional flexibility, the district court, in its discretion, gave a flexible instruction. And, as the U.S. Department of Justice highlighted, an instruction adopting a rigid SSPPU rule would have been contrary to law and constituted legal error. U.S. Br. 19-20.

In contrast to the district court's flexible instruction, HTC proposed a rigid cost-based jury instruction on "non-discrimination" that was unduly restrictive, untenable and would have constituted legal error had it been given in the context of this FRAND contract action involving a global portfolio license. HTC described the contours of non-discrimination as "requir[ing], at a minimum, offering like terms to

competing implementers" and HTC added that "there was no dispute that several direct competitors of HTC had received lower rates." HTC Br. 22. Even in its proposed instruction, HTC paid lip service to the idea that financial terms may differ between different competing licensees but it then went on to say that "[t]he non-discrimination prong of FRAND . . . prohibit[s] preferential treatment that imposes different costs to different competitors." HTC Br. 40. Nokia is not privy to the details of HTC's analysis of parallel license agreements between Ericsson and other manufacturers (HTC Br. 44) but it appears that HTC believes Ericsson's offer may have been discriminatory simply because several of its competitors "had received lower rates." HTC Br. 22. To the extent HTC suggests in the context of this case that the "ND" (non-discrimination) portion of "FRAND" requires that licenses impose the *same costs* on *similarly situated competitors,* such that any difference in costs between two global portfolio licenses would render the licenses to be discriminatory, that would be incorrect. The non-discrimination requirement does not forbid licenses that "impose different costs" on competitors.

This makes sense considering that different licensees—or purportedly similarly situated competitors—often have different operational structures and requirements in terms of their business models, what they want from a license, and the risks they are willing to take in the way they structure their licenses (e.g., lump sum guaranteed payments versus running royalties). For example, some companies

may seek a running royalty that requires no up-front payment or commitment on its part and thus less risk should its sales decline or its average sales prices erode over time. Other firms may prefer up-front, lump-sum payments, without any guarantee that anticipated sales may be met during the term of the license. Each arrangement represents different risks being taken on by the licensor and licensee and different economic considerations.

In addition, even among running royalty licenses there are sometimes different royalty structures that may be preferred by one licensee versus another (e.g. *ad valorem* v. per-unit rates or caps or floors on *ad valorem* royalties). These differing structures likewise reflect differing risks and economic considerations. As a result, simply insisting that "costs" must somehow be equivalent between each licensee (whatever that means or however it may be calculated) unfairly ignores the different choices that individual licensees may make to account for their unique business situations or economic considerations. This illustrates the ways in which different cost structures may be better suited or more appropriate than others in license agreements with seemingly similarly situated competitors as a result of differences in operational structures or business models.

The non-discrimination requirement of FRAND must be understood in light of ETSI's original intent and the policy concerns surrounding the desired non-discrimination. ETSI's original focus was to prevent entrants from being locked out

of the market. That is, the original boundary of non-discrimination was simply to keep SEP-holders from effectively preventing an existing competitor or a new competing entrant from using the standard and operating in the market at all. It was not intended to require that SEP-holders impose the exact same "costs" on all competing licensees—such a requirement would operate the same way as a most-favored license clause, which ETSI affirmatively abandoned in 1994. *See* Jorge Contreras, *Origins of FRAND Licensing Commitments in the United States and Europe* in THE CAMBRIDGE HANDBOOK OF TECHNICAL STANDARDIZATION LAW 168 (Jorge Contreras ed., 2018). Non-discrimination, therefore, simply requires that SEP holders do not effectively prevent new competing entrants or existing competitors from using the standard, for example, through the use of substantially dissimilar licensing terms. It does not, however, require SEP-holders to impose the exact same costs or same terms on similarly situated competitors, as the overall value in an SEP license agreement may be, and often is, composed of numerous elements depending on, for example, the licensee's business and operating model.

## II. COMPARABLE LICENSES ARE OFTEN THE BEST WAY TO VALUE SEP PORTFOLIOS AND DETERMINE WHETHER AN OFFER IS FRAND

### A. Valuation of SEP Portfolios Must Strike the Appropriate Balance Between Access to Technology and Incentive to Innovate.

The explicitly stated goals that underly the ETSI IPR Policy are twofold. The *first* goal is to ensure that the best technical solutions are chosen for ETSI standards

and, accordingly, that SEP claims covering such technologies are available for use in implementing the relevant standards. The *second* and equally important goal is to ensure that IPR owners are adequately and fairly rewarded for use of their IPR in implementing the standards. *See* ETSI IPR Policy, Art. 3. Because these goals underlie and give rise to the FRAND commitment itself, neither should be disregarded by courts when dealing with FRAND-related issues.

The focus cannot just be on making SEP claims available to implementers as cheaply as possible. Instead, courts addressing FRAND-related issues must give due account to whether SEP owners are being adequately compensated for their risk-taking, investments, and contributions to the standards. To do so, courts must properly consider the effect FRAND determinations will have on incentives to continue to innovate. A skewed approach that is intended to devalue SEP portfolios—like the misguided and unsupported SSPPU approach proposed by HTC that dismisses comparable licenses—would distort the requisite balance and would have the real potential to undercompensate SEP owners. This in turn would reduce incentives to continue participating in open standards-setting and development that has made patended innovations more widely available and that has resulted in the tremendously successful telecommunications industry over the past several decades.

The ETSI IPR Policy in its current form has been highly successful in practice. Hundreds of licenses have been concluded through bilateral negotiations, which has

resulted in widespread and beneficial implementation of the standards published by ETSI. The ETSI IPR Policy has also enabled new implementers to enter the marketplace, some of whom have become industry leaders over a relatively short period of time. In short, with decades of experience now and numerous license agreements executed by all the major SEP owners and implementers, the flexible concept of FRAND, as reflected in the ETSI IPR Policy, has worked and the industry has thrived. It is this long track record of industry success that HTC now seeks to derail by ignoring comparable licenses in favor of a proposed global SSPPU approach for valuing SEP portfolios. This should not be allowed to happen.

**B.    Using Comparable Licenses to Determine Whether an Offer is FRAND Typically Values SEP Portfolios Properly and Promotes Innovation.**

To determine whether offered license terms for SEP portfolios are FRAND, courts can and should look first to market-based evidence of prior licenses. Comparable licenses, where available, provide actual market data regarding the value of patented technology. That data should as a starting point be used to evaluate whether an SEP owner's offer rises to the level of being inherently unfair or unreasonable—the relevant inquiry when evaluating a FRAND offer.

Relying on comparable licenses as a primary measure to establish the market value of patented technology is also wholly consistent with existing Federal Circuit law. That court has consistently recognized that market data, e.g., comparable

16

licenses, is often the best indicator of a patent's value because industry participants are driven to strike the balance between access to technology and proper incentives to innovators. *See Monsanto Co. v. McFarling*, 488 F.3d 973, 978 (Fed. Cir. 2007) (comparable licenses are "usually the best measure of the 'reasonable' royalty"); *LaserDynamics, Inc. v. Quanta Comput., Inc.,* 694 F.3d 51, 79 (Fed. Cir. 2012) ("[A]ctual licenses to the patented technology are highly probative as to what constitutes a reasonable royalty"); *Summit 6, LLC v. Samsung Elecs. Co.,* 802 F.3d 1283, 1296 (Fed. Cir. 2015) ("A party may use the royalty rate from sufficiently comparable licenses"); *Apple Inc. v. Motorola, Inc.,* 757 F.3d 1286, 1325 (Fed. Cir. 2014) ("As we have held many times, using sufficiently comparable licenses is a generally reliable method of estimating the value of a patent"), *overruled on other grounds by Williamson v. Citrix Online, LLC,* 792 F.3d 1339 (Fed. Cir. 2015); *Nickson Indus., Inc. v. Rol Mfg. Co.,* 847 F.2d 795, 798 (Fed. Cir. 1988) ("Where an established royalty exists, it will usually be the best measure of what is a 'reasonable' royalty"). Foreign courts have found the same. *Unwired Planet Int'l Ltd. v. Huawei Techs. Co.,* [2017] EWHC 711, ¶ 476 (Pat.) (May 4, 2017) (looking to comparable licenses).

In this appeal, HTC argues that apportioning patent value is a necessary component of determining whether royalties are reasonable under FRAND, and accordingly, the district court erred by disregarding apportionment and instructing

17

the jury that no rules applied. HTC Br. 25-26. HTC's suggested approach runs contrary to the proper valuation of SEP portfolios, and, if adopted, would jeopardize future investments in standardized technologies.

In fixating on apportionment, HTC dismisses comparable licenses. In effect, HTC argues that comparable licenses should not be trusted if they do not square up when measured against a contrived "apportionment" analysis put forth by a party in litigation. HTC contends, for example, that comparable licenses may embed non-FRAND rates in the marketplace. *See* Dkt. 536 at 11. As both a licensor and licensee of SEPs, Nokia believes this position is misguided. Licenses covering SEPs are entered into by sophisticated industry members who have every incentive not to overpay. The empirical evidence shows that licensees, including new market entrants, have been able to enter into SEP license agreements and become successful in the telecom industry.

Moreover, when comparable licenses exist, there is no need to conduct the apportionment analysis that HTC advocates here as a replacement for such comparable licenses. Nokia agrees with the U.S. Department of Justice that "apportionment is 'already built in' to market-based evidence, such as licenses." U.S. Br. 18 (citing *CSIRO*, 809 F.3d at 1303); *see also Elbit Sys. Land & C41 Ltd. v. Hughes Network Sys., LLC*, 927 F.3d 1292, 1301 (Fed. Cir. 2019) ("apportionment 'is essentially embedded'" in prior licenses).

Prior licenses typically already reflect the market value of the technology. To be sure, these licenses were previously negotiated by experienced industry participants with strong incentives not to pay more than the market value. In short, with comparable licenses, the market has already conducted the necessary apportionment. There is no need to toss these global portfolio licenses out as relevant market data in favor of some *de novo* and unsupported apportionment analysis, which is exactly what HTC now suggests. Not only would such an approach be inconsistent with applicable U.S. law, it would also improperly devalue SEPs and disincentivize continued research and development in new technologies by innovators.

HTC also points to the decision in *TCL Communication Technology Holdings, Ltd. v. Telefonaktiebolaget LM Ericsson* ("*TCL*") as a roadmap for valuing global SEP portfolio licenses. Nos. SACV14-341JVS(DFMx), CV15-2370, 2018 WL 4488286 (C.D. Cal. Sept. 14, 2018), *rev'd by TCL Commc'n Technology Holdings Ltd. v. Telefonaktiebolaget LM Ericsson*, Nos. 18-1362, 18-1732, 18-1380, 18-1382, 2019 WL 6598216 (Fed. Cir. Dec. 5, 2019). But that decision was recently reversed by the Federal Circuit and remanded for a new jury trial. As a result, it no longer provides relevant guidance for consideration in the valuation of global SEP portfolios.

In Nokia's experience, the assessment of appropriate FRAND royalties should start with real-world, market data from comparable licenses when available. By ignoring comparable licenses and proffering an apportionment analysis that, by design is intended to generate lower applicable royalty rates, HTC is essentially seeking a radically better deal than others in the industry, as opposed to an agreement on FRAND terms. HTC's position runs right into its own non-discrimination arguments, and in Nokia's view, should be rejected.

## CONCLUSION

For the reasons set forth above, *amicus* respectfully submits that the judgment should be affirmed.

Date: December 13, 2019          Respectfully submitted,

By: /s/ Andrew J. Tuck
Andrew J. Tuck
ALSTON & BIRD LLP

*Counsel for Amicus Curiae*
*Nokia Technologies Oy*

## CERTIFICATE OF SERVICE

I hereby certify that on December 13, 2019, a true and correct copy of the foregoing Brief of *Amicus Curiae* Nokia Technologies Oy in Support of Defendants-Appellees Telefonaktiebolaget LM Ericsson and Ericsson, Incorporated was served via electronic filing with the Clerk of Court and all registered ECF users.

December 13, 2019                              */s/ Andrew J. Tuck*
                                              Andrew J. Tuck

## CERTIFICATE OF COMPLIANCE

1.    This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 29(a)(5) and Federal Rule of Appellate Procedure 32(a)(7)(B). This brief, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) contains 4,578 words.

2.    This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6). This brief has been prepared in a proportionally spaced typeface using Microsoft Word, in 14 Point Times New Roman.

Date: December 13, 2019         */s/ Andrew J. Tuck*

                                 Andrew J. Tuck
                                 ALSTON & BIRD LLP

                                 *Counsel for Amicus Curiae*
                                 *Nokia Technologies*